**NORTHLAND POWER,
et al., Plaintiffs,**

v.

**GENERAL ELECTRIC, CO.,
et al., Defendants.**

No. C–1–96–632.

United States District Court,
S.D. Ohio,
Western Division.

June 4, 1999.

Louis Francis Gilligan, Patrick F. Fischer, Joseph M. Callow, Jr., Keating Muething & Klekamp—1, Cincinnati, OH, for Plaintiffs.

Robert Alexander Pitcairn, Jr., Katz, Teller, Brant & Hild, Cincinnati, OH, James Matthew Hall, Jr., Julia B. Meister, Taft Stetinius & Hollister, Cincinnati, OH, Todd Hunter Bailey, Frost & Jacobs, Cincinnati, OH, for Defendants.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Motions for Summary Judgment by Defendant Kvaerner Hydro Power, Inc. d.b.a. Kvaerner Energy (hereinafter, "Kvaerner") (docs. 21 & 53) and Defendants Chromalloy American Corporation, Chromizing Company, and Chromalloy Gas Turbine Corporation (collectively, "Chromizing") (docs. 24 & 55); Plaintiffs' Memoranda in Opposition (docs. 28 & 58); Defendants' Replies (docs. 31 & 61); Notice of Filing Supplemental Authorities in Support of Motion for Summary Judgment by Defendant Chromizing (doc. 63); Plaintiffs' Supplemental Authority in Response to Defendants' Supplemental List of Authorities (doc. 73); Affidavits of Plaintiffs' and Defendants' Counsel in Support of Canadian Law Cited (docs. 75, 76, 78 & 79); and a Supplemental Memorandum in Response to Plaintiffs' April 26 Submission by Defendant Chromizing.

Also before the Court is a Motion by Third–Party Defendant General Electric Company for Leave to File Motion to Dismiss and Motion to Sever (doc. 62); Third–Party Plaintiff Chromizing's Memorandum in Response to Third–Party Defendant's Motion (doc. 67); and Third–Party Defendant's Reply (doc. 70).

The Court held hearings on Defendants' Motions for Summary Judgment on March 9, 1999 and April 27, 1999.

## BACKGROUND

Canadian electrical-power suppliers and their subrogated insurance company bring this action to assert tort and contract claims arising from the 1994 failure of a gas generator engine being used to produce commercial electric power in Ontario, Canada. Jurisdiction in this matter is based on 28 U.S.C. § 1332.

Plaintiffs Northland Power, Northland Power Corporation, Cochrane Power Corporation, Kirkland Lake Power Corporation, and Boiler Inspection and Insurance Company of Canada (collectively, "Plaintiffs") originally filed a complaint on June 21, 1996 against Defendants Kvaerner, Chromizing, General Electric Company, GE Aircraft Engines, GE Marine and Industrial Engines and Service Division (col-

lectively, "GE"), and Stewart and Stevenson Services, Inc. (doc. 1).

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(I), Plaintiffs voluntarily dismissed GE from the action without prejudice on October 4, 1996 (doc. 5) and they dismissed Stewart and Stevenson Services, Inc., without prejudice on January 7, 1997 (doc. 7). However, Defendant Chromizing filed a third-party complaint against GE on November 12, 1998 (doc. 47), bringing GE back into the action as a third-party defendant. GE filed an answer on December 7, 1998 (doc. 51) and a Motion for Leave to File Motions to Dismiss and Sever on February 26, 1999 (doc. 62). In addition, Defendant Kvaerner filed a cross-claim against Defendant Chromizing on July 1, 1998 (docs. 35 & 37). Defendant Chromizing filed an answer to the cross-claim on July 28, 1998 (doc. 38).

As mentioned above, the multitude of claims in this action arise out of the 1994 failure of a gas generator engine operated at Plaintiff Cochrane Power Corporation's generating station in Ontario, Canada (doc. 1). Plaintiffs Northland Power, Northland Power Corporation (collectively, "Northland Power"), Cochrane Power Corporation, and Kirkland Lake Power Corporation are affiliated entities who supply electrical power in Ontario (docs. 21 & 28). Plaintiff Boiler Inspection and Insurance Company of Canada (hereinafter, "BI & I") is a Canadian insurance company that provides certain insurance coverage to the above affiliated entities (doc. 1). BI & I is a party to this action as a subrogated insurer (*Id.*).

Defendant Kvaerner, which operates a facility in Ohio, is an affiliate of a Norwegian company that, among other things, tailors gas generator engines to meet the specifications of customers such as the electrical-power suppliers in this case (doc. 21). Defendant Chromizing operates an engine repair and refurbishment facility in California. In 1993, Kvaerner's Ohio facility subcontracted the refurbishment of a set of gas generator engine parts to Chromizing (doc. 31).

The following facts are not in dispute (*see* docs. 21, 28, 31, 53, & 58). In 1992, executives from Northland Power, the corporate manager of Plaintiffs' operations, and executives from Kvaerner began to discuss Plaintiffs' need for a spare gas generator engine. At the time, Plaintiffs operated a total of four gas turbines at their Cochrane and Kirkland Lake generating stations. A gas turbine is comprised of a gas generator engine and a power turbine, also known as a low-pressure turbine (*see* doc. 61, Att. 1). Within each gas generator engine is an interchangeable module known as the "hot section." The hot section consists of two rows of nozzles and two rows of rotating high-pressure turbine ("HPT") blades. These rows of nozzles and blades are identified separately as "Stage 1" and "Stage 2."

Whenever the hot section of one of these gas generator engines needed maintenance or repair, Northland Power temporarily leased replacement engines. However, these leasing arrangements were expensive, and Northland Power decided the purchase of a spare engine would be more cost-effective. To that end, Northland Power and Kvaerner negotiated the purchase of a used gas generator engine. The gas generator engine that the Parties negotiated for purchase had originally been manufactured in 1984 by GE and was identified by the number 691–025 (hereinafter, "Spare Engine 691–025"). Kvaerner thereafter began to tailor Spare Engine 691–025 to meet Northland Power's specifications.

Meanwhile, one of the gas generator engines Northland Power already owned (hereinafter, "Engine 481–615") developed a crack in its compressor rear frame. Northland Power removed Engine 481–615 and sent it to Kvaerner's Norway facilities for repair. A contract, referred to by Plaintiffs as "Purchase Order 6811" and entered into on December 19, 1992 (hereinafter, "1992 Purchase Order"), explained the work to be performed on Engine 481–615 (*see* doc. 28, Ex. 4, McKay Aff., Exs. A

& B). This repair included the refurbishment of Engine 481–615's hot section and its Stage 2 HPT blades (*Id.*). Northland Power hoped to save money by refurbishing the blades rather than replacing them (*Id.,* Ex. 3, Focke Dep.). Therefore, in January 1993, Kvaerner began the repair of Engine 481–615's hot section, shipping the blades to Chromizing's California facilities for refurbishing.

The repair and refurbishment of Engine 481–615's hot section was expected to take some time, and since Spare Engine 691–025 was not yet completely adapted for Northland Power's use, Northland Power was one engine short at its generating stations. Nevertheless, knowing that the new hot section for Spare Engine 691–025 was available for use, Northland Power conceived of a plan to avoid entering into a lengthy lease arrangement. The plan involved the interchange of hot sections from Spare Engine 691–025 and Engine 481–615.

First, Northland Power asked Kvaerner to install the new hot section components Kvaerner had just finished assembling for Spare Engine 691–025 into the engine it currently owned, Engine 481–615. With the new hot section installed, Engine 481–615 could go back into operation as early as February 1993. Then, once Kvaerner and Chromizing finished their repair and refurbishment of the old hot section from Engine 481–615, that old hot section from Engine 481–615 would be placed into Spare Engine 691–025.

The Parties signed a Purchase Agreement related to Spare Engine 691–025 on June 16, 1993 (hereinafter, "1993 Purchase Agreement") (*see* doc. 21, Ex. A), and Kvaerner delivered Spare Engine 691–025 to Northland Power on June 22, 1993. Northland Power placed the engine into service at its Cochrane generating station. One year and two days later, on June 24, 1994, Spare Engine 691–025 stopped running. Within hours, a Northland Power employee determined that the engine had failed due to a broken Stage 2 HPT blade. Between June 25 and June 27, 1994, an investigator for Northland Power's insurance carrier, BI & I, inspected the failed engine and confirmed the Northland Power employee's original finding.

Northland Power then shipped the failed engine from Ontario to Kvaerner's Ohio facility where, on July 7 and 8, 1994, Kvaerner employees disassembled the engine in the presence of Northland Power and BI & I representatives. Northland Power's insurance claim, submitted to BI & I on March 21, 1995, described the preliminary findings of this group:

> The incident was caused by the failure of a Stage 2 HPT blade at ⅔ of its length, measured from the root. This blade destructed all of the other Stage 2 HPT blades and the Stage 2 HPT nozzle assembly beyond salvage. The incident caused compressor blade tip rubbing which resulted in aluminum splatter potentially obstructing the cooling passages of Stage 1 HPT nozzles and blades. Additionally Stage 2 HPT debris moved upstream damaging Stage 1 HPT blades and downstream damaging the turbine midframe (TMF) and the [Low Pressure Turbine (LPT) ].

(doc. 21, Ex. B). Later, investigators determined that GE had originally manufactured this blade and that Chromizing had refurbished the blade as subcontractors for Kvaerner in 1993.

While the investigation of the failed blade continued, Northland Power asked Kvaerner to repair the failed gas generator engine. Kvaerner completed the repair, and Northland Power reinstalled Spare Engine 691–025 at its Cochrane generating station on August 13, 1994. Subsequently, BI & I paid Northland Power's insurance claim. In the instant action, BI & I seeks to recover as a subrogated insurer the more than $1.6 million it paid to reimburse Plaintiffs for damages to the gas generator engine, power turbine, and what Plaintiffs refer to as "other property" (doc. 28).

Defendant Kvaerner filed a motion for summary judgment on March 9, 1998, al-

leging that a limitation of actions provision in the 1993 Purchase Agreement bars Plaintiffs' action (doc. 21). Defendant Chromizing followed on April 16, 1998 with a motion for summary judgment based on the economic loss doctrine (doc. 24). Thereafter, Plaintiffs requested leave to file a second amended complaint to assert that the 1992 Purchase Order, and not the 1993 Purchase Agreement, governed the rights and duties of the Parties (*see* doc. 33). The Court granted Plaintiffs' request and ordered the Parties to amend their motions for summary judgment based on Plaintiffs' second amended complaint (docs. 32 & 40). Defendants Kvaerner and Chromizing did so, filing amended motions for summary judgment on December 14, 1998 and December 15, 1998 respectively.

## STANDARD OF REVIEW

The narrow question that we must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Id.* at 321, 106 S.Ct. 2548; *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405 (6th Cir.1992); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Guarino,* 980 F.2d at 405.

As the Supreme Court stated in *Celotex,* the non-moving party must "designate" specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Guarino,* 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions must be presented with enough specificity that the district court can readily identify the facts upon which the no' " *Guarino,* 980 F.2d at 405 (quoting *Inter-Royal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990).

## DISCUSSION

In this case, the Court must decide (1) whether, as a matter of law, a limitation of actions provision found in a contract between Plaintiffs and Defendant Kvaerner bars Plaintiffs' action; (2) whether the economic loss doctrine precludes Plaintiffs' recovery in tort against Defendant Chromizing; and (3) whether a derivative cause of action against Third–Party Plaintiff GE survives the Court's resolution of the aforementioned motions for summary judgment. The following sections provide the Court's analysis and conclusions regarding these issues.

### I. Defendant Kvaerner's Motion for Summary Judgment

Defendant Kvaerner seeks summary judgment on the ground that Plaintiffs failed to bring this action within the time

allowed under a limitations of actions provision found in the 1993 Purchase Agreement.

## A. Choice of Law Analysis

██ Initially, since this case is before the Court on the basis of diversity jurisdiction, the Court must decide which state substantive law to apply before proceeding to the merits of the issue at bar. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Garden City Osteopathic Hosp. v. H.B.E. Corp.,* 55 F.3d 1126, 1130 (6th Cir.1995). In making this decision, the Court must first look to the forum state's choice of law rules. *Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 4, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie,* 304 U.S. at 74–77, 78, 58 S.Ct. 817).

Ohio follows the Restatement (Second) of Conflict of Laws for determination of the law applicable in contract and tort actions. *See Barge v. Jaber,* 831 F.Supp. 593, 596–97 (S.D.Ohio 1993); *Cheatham v. Thurston Motor Lines,* 654 F.Supp. 211, 213 (S.D.Ohio 1986); *Nationwide Mutual Ins. Co. v. Ferrin,* 21 Ohio St.3d 43, 44–45, 487 N.E.2d 568, 569–70 (1986); *Morgan v. Biro Mfg. Co.,* 15 Ohio St.3d 339, 341–42, 474 N.E.2d 286, 288–89 (1984).

In this case, Plaintiffs assert both contract and tort claims against Kvaerner. Thus, this Court must apply the principles found in §§ 187 and 188 of the Restatement (Second) of Conflict of Laws to determine the law applicable to the contract claim and the principles found in §§ 6 and 145 to determine the law applicable to the tort claim.

██ First, as for the contract claim, § 187 of the Restatement (Second) of Conflict of Laws provides that the law of the state chosen by contracting parties to govern their contractual rights and duties generally applies unless the chosen state lacks a substantial relationship with the parties or the transaction or unless the application of the law would violate the public policy of another state with a greater interest. If the parties fail to choose a particular state's law, or if their choice is ineffective, Ohio follows § 188. Section 188 provides, in pertinent part:

> In the absence of an effective choice of law by the parties ..., the contacts to be taken into account ... to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and
>
> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
>
> . . .

§ 188 Restatement (2d) Conflicts. In the matter before this Court, the Parties disagree about which of two contracts—the 1992 Purchase Order or the 1993 Purchase Agreement—covers the rights and duties of the Parties relating to the Stage 2 HPT blade that broke in 1994, causing a gas generator to fail.

We note that the 1992 Purchase Order, which Plaintiffs assert should be used to define the Parties' rights and duties, does not specify which law applies to disputes arising between the Parties. Nonetheless, Plaintiffs argue that Ontario law applies because (1) the contract originated in Ontario; (2) the Parties negotiated the 1992 Purchase Order in Ontario; and (3) Ontario holds the greater interest in resolving the dispute since the gas generator failed in Ontario while supplying electrical power.

Kvaerner does not dispute that Ontario law should be applied. Instead, Kvaerner urges this Court to use the 1993 Purchase Agreement to define the rights and duties of the Parties in this matter and Kvaerner points out that Section 12 of the 1993 Purchase Agreement provided, in pertinent part:

(a) *This Agreement shall be construed in accordance with the laws of the province of Ontario regarding disputes by and among the parties hereto.* The rights and obligations of the parties shall not be governed by the provisions of the 1980 U.N. Convention on Contracts for the International Sale of Goods.

(doc. 21, Ex. A) (emphasis added).

Insofar as the 1992 Purchase Order originated in Ontario, was negotiated in Ontario, and involved property owned by Ontario electric-power suppliers, we conclude that under § 188 principles Ontario bears the most significant relationship to this matter. In addition, insofar as the Parties explicitly selected Ontario law in a choice-of-law provision in the 1993 Purchase Agreement, this Court finds pursuant to § 187 that Ontario law is applicable to the claims arising therefrom.[1]

■ Secondly, as for the tort claim, § 145 of Restatement (Second) of Conflict of Laws states:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

§ 145 Restatement (2d), Conflict of Laws. In the instant matter, the injury occurred in Ontario and the contractual relationship of the Parties is based in Ontario. Based on this, Plaintiffs argue that Ontario has the most significant relationship to the occurrences and parties in this case. Kvaerner does not appear to dispute the application of Canadian tort principles to Plaintiffs' claims against Kvaerner. Therefore, this Court finds Plaintiffs' arguments persuasive and, thus, as between Plaintiffs and Defendant Kvaerner, this Court will apply Canadian tort law.

## B. Limitation of Actions Provision

As noted in the preceding subsection, Defendant Kvaerner asserts in its Motion for Summary Judgment that a limitation of actions provision found in the 1993 Purchase Agreement bars Plaintiffs' action before this Court. The limitation of actions provision, § 12(a), states, in pertinent part, that "[a]ny action arising out of or related to this Agreement must be commenced within one (1) year from the date the right, claim, demand or cause of action shall first occur, or be barred forever."

The signatory parties to the 1993 Purchase Agreement included (1) Kvaerner as the Seller; (2) a financing entity, Newcourt Credit Group, Inc., as Purchaser; and (3) Northland Power, Cochrane Power, and Kirkland Lake Power corporations as Lessees of the financing entity, Newcourt.

■ In support of its argument that the 1993 Purchase Agreement governs this action, Kvaerner notes that the 1993 Purchase Agreement lists the hot section containing the Stage 2 HPT blade that failed on June 24, 1994 in the Agreement's "Exhibit A:"

**High Pressure Turbine Rotor (HPR)**

Single Shank. Original from GG 481–615

P/N L31397G13 s/n SPK 02800

---

1. The Court acknowledges that the Parties' counsel submitted affidavits attesting to the fact that the Canadian law cited in their briefs is still followed by Canadian courts (*see* docs. 75, 76, 78 & 79).

Tot. time app. 14000 hours. S.O.H. 0.0 hours.

(doc. 21, Ex. A). In addition, Kvaerner contends that the warranty Plaintiffs relied upon in their first amended complaint is found in § 5(b) of the 1993 Agreement. Section 5(b) provides, in pertinent part:

Seller further represents and warrants to the Purchaser and the Lessees that the Gas Generator Engine meets or exceeds General Electric acceptance test performance standards for new engine acceptance based on testing done on the Gas Generator Engine by Seller or its affiliates.

*Id.* Essentially, Kvaerner argues that, by listing the "old" hot section from Engine 481–615 in the 1993 Purchase Agreement as a part of the "new" Spare Engine 691–025 and by providing a warranty for the entire Spare Engine 691–025, the Parties agreed that their rights and duties related to the old hot section would arise from the 1993 Purchase Agreement.

Kvaerner also points to the February 12, 1993 communication between Northland Power and Kvaerner executives in which Northland Power reminded Kvaerner that the corporation expected a "formal detailed proposal on the total engine package" (doc. 28, Ex. 4, McKay Aff., Ex. G). Kvaerner provided this proposal, and after further negotiations, the Parties signed the Purchase Agreement on June 16, 1993 (*see* doc. 31). Kvaerner also avers that, following the failure of the gas generator engine in 1994, Northland Power executives turned to the 1993 Purchase Agreement to discuss their rights of recovery against Kvaerner. When the plant manager of the Cochrane generating station, Ford Scissons, was asked during a deposition about 1993 Agreement, he answered:

To the best of my recollection, the first time I saw this agreement was, I requested a copy at the time of the failure of engine 025, because on [sic] the fact that the failure occurred very close to first year operation of the engine. And I wanted to look up where we stood as far as the warranty was concerned.

(Scissons Dep. at 9). Furthermore, during the March 9, 1999 hearing on this matter, Kvaerner drew the Court's attention to a statement made by Northland Power in its insurance claim to BI & I noting that Spare Engine 691–025's "one year warranty had technically expired by two days" (*see* doc. 21, Ex. B). This warranty, Kvaerner argues, is found in the 1993 Purchase Agreement.

Finally, Kvaerner asserts that § 12(g) of the 1993 Agreement is an integration clause that eliminates the need of this Court to examine any earlier written or oral agreements. Section 12(g) states, in pertinent part:

This agreement, including the schedules hereto, and any other related documents, constitutes the entire agreement between the parties hereto and supercedes all prior written or oral communications or understandings between the parties, except as provided in Section 13 hereof. The Agreement shall not be amended except by a written agreement signed by the parties hereto.

Thus, Kvaerner asserts that, according to Ontario law, this Court should analyze the rights and duties of the Parties in this case by applying only the language provided within the four corners of the 1993 Purchase Agreement. In *KPMG Inc. v. Canadian Imperial Bank of Commerce,* No. C28036, 1998 CarswellOnt 4422 (Ont.Ct.App. Nov. 16, 1998), the Court of Appeals for Ontario wrote:

"The cardinal interpretive rule of contracts ... is that the court should give effect to the intention of the parties as expressed in their written agreement. Where that intention is plainly expressed in the language of the agreement, the court should not stray beyond the four corners of the agreement."

*Id.* In sum, Kvaerner argues that the Parties in this action are all sophisticated commercial entities who bargained for a set of rights and duties related to the entire Spare Engine 691–025, including a one-

year limitation of actions provision that bars the instant litigation.

Plaintiffs, on the other hand, contend that the 1992 Purchase Order, which does not contain a limitation of actions provision, governs the rights and duties of the Parties as related to the failed Stage 2 HPT blade. On June 25, 1998, Plaintiffs filed a second amended complaint to allege that the governing document was the 1992 Purchase Order rather than the 1993 Purchase Agreement (*see* doc. 33).

Central to Plaintiffs' argument is their assertion that the 1992 Purchase Order governed the work performed on the failed Stage 2 HPT blade (*see* doc. 28, Ex. 5, Richards Dep. at 173, 178 & 253). It is this work that Plaintiffs allege Defendant Chromizing performed negligently. Moreover, Plaintiffs contend that the 1993 Agreement essentially dealt only with the sale of Spare Engine 691–025. They point out that the $1.9 million purchase price reflected the cost of the "new" Spare Engine 691–025 together with the "new" hot section that had already been placed into Engine 481–615 and not the cost of the refurbishment of the "old" hot section that was placed into Spare Engine 691–025. They argue that this sales agreement cannot express the rights of Plaintiffs in regards to a product they already owned.

Nonetheless, after reviewing the record in this matter and hearing the arguments of the Parties, this Court finds Kvaerner's assertions persuasive. We find that the Parties to this action are sophisticated, commercial entities who negotiated a contract providing a one-year warranty for an entire engine consisting of both new and old components. The 1993 Agreement, while primarily a sales contract, specifically mentioned the old hot section and included an integration clause, thereby eliminating the need for the Parties to invoke warranties possibly found in previous oral or written agreements. Thus, we hold that the 1993 Agreement represents the entire agreement between Plaintiffs and Kvaerner and provides the rights and duties of the Parties as related to the allegedly defective Stage 2 HPT blade.

Since the Court finds that the 1993 Purchase Agreement applies in this case, the Court must next determine whether Ontario law allows contracting parties to include limitation of actions clauses and, if so, whether Plaintiffs failed to file this action within the time allowed under the limitation of actions provision in the 1993 Purchase Agreement.

Kvaerner argues that Ontario law generally allows contracting parties to include one-year limitation of actions provisions. Specifically, Kvaerner notes that Ontario courts have upheld the validity of contractual limitation provisions in the insurance context in which the bargaining positions of the contracting parties are less equal than those between sophisticated commercial parties. *See Ontario Housing Corp. v. Canadian Gen. Ins. Co.,* No. 94–CQ–56056, 1996 CarswellOnt 2171 (Ont.C.J. May 31, 1996) (finding that the failure to initiate a claim against the insurers within one year amounted to non-compliance with a contractual term and prevented the insured from enforcing the contract); *see also Smith v. Empire Life Ins. Co.,* No. 34860/94, 1996 CarswellOnt (Ont.C.J. Mar. 19, 1996) (noting that, generally, "limitation periods serve a useful purpose").

In recognition of Ohio's possible interest in this litigation (*see* § 187 of the Restatement (2d), Conflicts of Law), Kvaerner asserts that limitation of actions provisions are also not automatically void in Ohio as against public policy. The Ohio Supreme Court has held that a contractual provision may limit the time for bringing an action provided the period of limitation is reasonable. *See Miller v. Progressive Cas. Ins. Co.,* 69 Ohio St.3d 619, 624, 635 N.E.2d 317, 321 (1994); *see also Hounshell v. American States Ins. Co.,* 67 Ohio St.2d 427, 430, 424 N.E.2d 311, 313 (1981) (finding that a limitation period of one year was not *per se* unreasonable).

Thus, Kvaerner submits that the validity of the limitation of actions provision "cannot seriously be questioned." Plaintiffs also do not dispute the general validity of limitation of actions provisions. This Court accordingly finds that the provision found in the 1993 Purchase Agreement is valid.

■ Kvaerner next contends that there is no genuine issue of material fact as to whether Plaintiffs commenced this action more than one year after the claims for relief first occurred. According to Kvaerner, Canadian law provides that a period of limitation begins to run "when the cause of action is complete." S.M. Waddams, *Product Liability* 176–180 (3d ed.1993). A contract cause of action is complete when the breach occurs. A tort action is complete when the damage is suffered or, in limited cases, when the damage is discovered. *Id.* A cause of action can also be said to accrue when "all elements of a civil wrong existed so as to enable a prima facie case to be proved." Jeremy S. Williams, *Limitation of Actions in Canada* 7–8 (2d ed.1980) (internal citations omitted).

Kvaerner asserts that, at the latest, and by using the most liberal accrual rule, Plaintiffs' cause of action against Kvaerner accrued March 21, 1995 when Northland Power submitted its insurance claim to BI & I. However, Plaintiffs did not file this action until June 21, 1996, one year and three months after filing the insurance claim. Thus, Kvaerner contends that any action brought by Plaintiffs against Kvaerner that arises out of the June 24, 1993 engine failure is barred as a matter of law.

This Court hereby finds that Plaintiffs filed this action beyond the one-year limitations period provided in the 1993 Purchase Agreement. Accordingly, any claims arising therefrom are barred as a matter of law.

### C. Plaintiffs' Tort Claims Against Kvaerner

■ Notwithstanding the above, Plaintiffs argue that, even if the 1993 Purchase Agreement governs this action, the limitation of actions provision fails to bar their tort claims against Kvaerner. Plaintiffs assert that the limitation of actions provision, § 12(a), only bars untimely disputes "arising out of or related to this Agreement" and that their tort claims arise out of the common law and not the 1993 Purchase Agreement.

In support of their argument, Plaintiffs note that § 5(c) of the 1993 Purchase Agreement (*see infra* at pp. 786) specified that any damages awarded in tort or contract actions would be limited to the contract price. However, the Parties did not specify that the one-year limitations period under § 12(a) would apply to both tort and contract actions. Plaintiffs argue that any ambiguity arising therefrom should be construed strictly against Kvaerner. *See Indemnity Ins. Co. v. Excel Cleaning Serv.* [1954] 2 D.L.R. 721, 730 (construing the ambiguities of a contract clause in a manner favorable to the insured); *Falcon Lumber Ltd. v. Canada Wood Specialty Co. Ltd* [1978] 95 D.L.R. (3d) 503, 509 (strictly construing language in exclusion clauses against the "maker" of the clause); *Upper Lakes Shipping Ltd. V. St. Lawrence Cement Inc.* [1992] 89 D.L.R. (4th) 722, 725–26 (strictly construing language in an indemnification clause).

Furthermore, Plaintiffs assert that many of provisions in the 1993 Purchase Agreement apply only between Kvaerner and Newcourt, the entity financing the purchase of Spare Engine 691–025, and not between the Lessee–Plaintiffs and Kvaerner. Therefore, Plaintiffs argue that Kvaerner's liability to Lessee–Plaintiffs for breach of a manufacturer's duty of care in tort does not arise out of the 1993 Purchase Agreement, but out of a duty imposed by common law. The determination of whether a dispute arises out of or is related to an agreement is a question of law for the Court. In addressing this issue, a Canadian judge recently explained:

> I cannot say that a dispute arises out of or in connection with a contract unless the existence of the contract is germane

either to the claim or the defence. It is not enough to say that the events that give rise to the claim also give rise to a claim for breach of contract. One must be able to say that the other claim relies on the existence of the contractual obligation.

*Kaverit Steel & Crane Ltd. v. Kone Corp.* [1992] 87 D.L.R. (4th) 129, 136–137.

In reply to Plaintiffs' contentions, Kvaerner asserts that the 1993 Purchase Agreement is related to Plaintiffs' tort claims. Kvaerner further argues that it satisfies the *Kaverit Steel* test because several sections of the 1993 Purchase Agreement are "clearly germane" to Kvaerner's defenses. Specifically, Kvaerner contends that the language in § 5(c), which states that the gas generator engine "is sold in 'as is' condition," forecloses any strict liability or negligence claims against it. Section 5(c) states:

Except as specifically warranted in this Section 5, THE GAS GENERATOR ENGINE IS SOLD TO PURCHASER "AS IS," NO OTHER CONDITIONS OR WARRANTIES APPLY TO SERVICE AND NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, WHETHER RELATED TO MERCHANTABILITY, COURSE OF PERFORMANCE, COURSE OF DEALING, USAGE OF TRADE, NONINFRINGEMENT OR OTHERWISE IS GIVEN BY SELLER TO PURCHASER OR ANY OTHER PARTY. SELLER SHALL NOT UNDER ANY CIRCUMSTANCES BE RESPONSIBLE FOR ANY LOSS OR DAMAGE, INDIRECT, SPECIAL, ORDINARY, EXEMPLARY, CONSEQUENTIAL OR OTHERWISE, ARISING OUT OF THE TRANSACTIONS CONTEMPLATED HEREUNDER. UNDER NO CIRCUMSTANCES SHALL SELLER'S TOTAL LIABILITY OF ALL KINDS ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING BUT NOT LIMITED TO ANY WARRANTY CLAIMS HEREUNDER), REGARDLESS OF THE FORUM AND REGARDLESS OF WHETHER ANY ACTION OR CLAIM IS BASED ON CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, EXCEED THE PURCHASE PRICE.

(doc. 21, Ex. A). In addition, Kvaerner points to § 7 as a possible defense to tort claims brought by Plaintiffs, who are the Lessees and Operator mentioned in the § 7:

Purchaser, the Lessees and the Operator agree that Seller shall have no liability to Purchaser, the Lessees and/or the Operator or to any third party for any ordinary, special, indirect, consequential, exemplary or other damages or losses that might arise directly or indirectly by reason of Purchaser's, the Lessees' and /or the Operator's or any other third party's use of the Gas Generator Engine.

(*Id.*) Finally, Kvaerner states that § 12(k), which permitted the company to subcontract the repair of the gas generator engine, relieves Kvaerner of any duty under tort law of knowing a subcontractor found a contaminant in the defective blade. Section 12(k) states:

Seller may use subcontractors authorized by the original manufacturer of the Gas Generator Engine as it deems necessary in the repair and refurbishment of the Gas Generator Engine prior to delivery to Purchaser, provided that warranty coverage would not be affected.

(*Id.*).

This Court finds persuasive Kvaerner's argument that the existence of the 1993 Purchase Agreement is "germane" to its defenses. Therefore, we conclude that Plaintiffs' failure to bring their tort claims within the time limit prescribed in § 12(a) of the 1993 Purchase Agreement bars any resolution of the claims by this Court. Accordingly, we hereby GRANT Kvaerner's Motion for Summary Judgment.

## II. Defendant Chromizing's Motion for Summary Judgment

Defendant Chromizing asserts that the economic loss doctrine bars Plaintiffs' recovery in tort as a matter of law because (1) the Parties to this action are commercial entities with equal bargaining power who allocated their risk of loss by obtaining insurance and a warranty in the 1993 Purchase Agreement and (2) Plaintiffs sustained only economic losses.

### A. Choice of Law Analysis

■ Before reaching the merits of Defendant Chromizing's Motion for Summary Judgment, we must address the choice-of-law issue. As noted earlier in Section I(A), Ohio follows § 145 of the Restatement (Second) of Conflict of Laws in determination of the applicable tort law. Section 145 states, in pertinent part:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

§ 145 Restatement (2d) of Conflict of Laws. Section 6, referenced in § 145, states that factors relevant to the choice of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

In the instant matter, Plaintiffs assert negligence, strict liability, and breach of implied warranty claims against Defendant Chromizing in relation to Chromizing's refurbishment of a Stage 2 HPT blade. Chromizing contends that California law should apply in the Court's resolution of these claims even though the gas generator engine failed at Plaintiffs' generating station in Ontario.

First, Chromizing argues that Plaintiffs' filing of their lawsuit in the United States indicates an expectation and preference for United States law. Secondly, Chromizing notes that California has an interest in the business activities of firms within its borders, and, thirdly, Chromizing contends that the application of California law would further the interests of conformity, predictability, and uniformity. *See In re Bendectin Litig.*, 857 F.2d 290, 304–305 (6th Cir.1988) (choosing in a products liability action to apply the law of the state in which the manufacturer was located since that state regulated the safety of the product). Finally, Chromizing asserts that California law is easier to apply than the law of Canada and that the outcome of this matter would be the same under the laws of either California or Canada.

In responding to Chromizing's motions, Plaintiffs do not directly advise the Court on this choice-of-law issue. However, Plaintiffs provide citations to California, Ohio, and Canadian law and, in doing so, they appear to agree that the outcome

would be the same regardless of which law this Court applies.

After weighing the factors found in §§ 6 and 145 of Restatement (Second) of Conflict of Laws, this Court finds that California bears the most significant relationship to this action's occurrences and Parties. Therefore, as between Plaintiffs and Defendant Chromizing, this Court will apply California law.

## B. Economic Loss Doctrine

Defendant Chromizing asserts that Plaintiff's complained-of losses in this case are solely commercial in nature, sustained by a business to its property and operations. Chromizing further notes that the gas turbine's failure on June 24, 1994 did not cause any personal injuries. For these reasons, Chromizing argues that Plaintiffs' claims are barred by the "economic loss doctrine."

 The economic loss doctrine precludes recovery on a products liability theory where a plaintiff's damages consist solely of economic losses. *See Seely v. White Motor Co.*, 63 Cal.2d 9, 17–18, 403 P.2d 145, 151–52, 45 Cal.Rptr. 17, 23–24 (1965) (finding that contract and warranty law is better suited to address purely economic losses); American Law Institute's proposed Restatement (3d) of Torts: Products Liability § 21(c) (allowing recovery of damages in tort only if caused by harm to "the plaintiff's property other than the defective product itself"). Economic losses are defined in California as " 'damage to the goods themselves and the costs of repair of such damage or a loss of profits that the deal had been expected to yield.' " *Dept. of Water & Power of City of Los Angeles v. ABB Power T & D Co.*, 902 F.Supp. 1178, 1186 (C.D.Cal.1995) (hereinafter, *"ABB Power"*) (quoting *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1376 (9th Cir.1978)). Here, Chromizing asserts, Plaintiffs' damages are the costs to repair the gas generator engine and power turbine and the loss of profits for the time the engine was out of service.

These damages, according to Chromizing, represent solely economic losses.

In *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 859–61, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), an admiralty case, the plaintiffs brought a products liability action against a turbine manufacturer after discovering that their supertankers carried defective turbines. *Id.* The plaintiffs sued to recover the cost of repair and for income lost while the tankers were out of service. The Supreme Court, however, affirmed summary judgment for the defendant, noting that the plaintiffs and defendant were commercial parties who had an opportunity to allocate risk through contract negotiation and insurance. *Id.* at 871–72.

Chromizing asserts that California courts follow the reasoning of *East River Steamship Corp.*, refusing to "authorize a tort claim for the recovery of economic loss from a third party such as [Chromizing] where the plaintiff is a sophisticated commercial party who exercised its bargaining power to reach a contract that incorporated its risks of loss" (doc. 55).

For instance, in *Kaiser Steel Corp. v. Westinghouse Elec. Corp.*, 55 Cal.App.3d 737, 746, 127 Cal.Rptr. 838, 844 (1976), the court noted that the doctrine of strict products liability primarily arose to protect injured consumers " 'who are powerless to protect themselves.' " *Id.* at 746–47, 127 Cal.Rptr. at 844 (finding that "[t]he rule of products liability is . . . rationalized as an inducement to manufacturers to design and produce a safe product . . . and as a means to avoid the artificial conditions to recovery in warranty created by the rules of privity [in consumer cases]"). This doctrine need not apply, however, where sophisticated commercial parties can allocate risks and take advantage of their rights and remedies under contract law. *Id.* Therefore, the *Kaiser* court ruled that doctrine of strict products liability would not apply as between parties who:

(1) deal in a commercial setting;

(2) from positions of relatively equal economic strength;

(3) bargain the specifications of the product; and

(4) negotiate concerning the risk of loss from defects in it.

*Id.,* 55 Cal.App.3d at 748, 127 Cal.Rptr. at 845 (citing *Southwest Forest Indus. v. Westinghouse Elec. Corp.,* 422 F.2d 1013, 1020 (9th Cir.1970)); *see also S.M. Wilson & Co.,* 587 F.2d at 1376 (arguing that the economic loss doctrine should apply to both negligence and strict liability claims); *Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 130, 501 P.2d 1153, 1160, 104 Cal.Rptr. 433, 440 (1972) (noting that recovery on a theory of products liability is precluded where damage consists solely of economic losses).

In this case, Chromizing contends that Plaintiffs "had significant knowledge of gas generator engines, substantial bargaining power, and the ability to negotiate specific contract terms" (doc. 55). Furthermore, during the April 27, 1999 hearing, Chromizing emphasized that Plaintiffs were fully aware of the risks of loss involved in refurbishing the blades rather than replacing them with new blades and that Plaintiffs allocated these risks by securing warranties in the 1993 Agreement and by obtaining insurance. In sum, Chromizing argues that the Parties in this case meet the factors outlined in *Kaiser.*

Chromizing avers that Canadian courts acknowledge similar policy concerns as California when excluding recovery for economic losses in cases involving sophisticated commercial parties.[2] *See Winnipeg Condominium Corp. v. Bird Constr. Co.* [1995] 1 S.C.R. 85, 97 (noting that the "question of recoverability for economic loss must be approached with reference to

the unique and distinct policy issues raised ... [and these issues] are concerned with determining the proper ambit of the law of tort"); *Rivtow Marine v. Washington Iron Works,* 40 D.L.R. (3d) 530, 1973 WL 40092 (1973); *Cattle v. Stockton Waterworks Co.* [1875] Q.B. 453. In *Rivtow Marine,* a Canadian judge noted one policy reason behind the economic losses doctrine:

[L]iability for the cost of repairing damage to the defective article itself and for the economic loss flowing directly from the negligence, is akin to liability under the terms of an express or implied warranty of fitness and as it is contractual in origin cannot be enforced against the manufacturer by a stranger to the contract.

*Id.* at 541, 1973 WL 40092 (citing *Trans World Airlines v. Curtiss–Wright Corp.,* 1 Misc.2d 477, 148 N.Y.S.2d 284 (1955)).

Nonetheless, in a supplemental brief filed after the motions deadline and the first hearing (doc. 73), Plaintiffs dispute the application of the economic loss doctrine in this case. Plaintiffs first assert that Chromizing provided a service in refurbishing the blades and that California law rejects the application of the economic loss doctrine in cases involving the performance of services. *See North Am. Chem. Co. v. Superior Court,* 59 Cal.App.4th 764, 777–79, 69 Cal.Rptr.2d 466, 472–73 (1997) (finding the economic loss doctrine inapplicable in a claim for the negligent performance of contractual obligations brought by a chemical manufacturer against a common carrier); *see also J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 803–804, 598 P.2d 60, 157 Cal.Rptr. 407 (1979) (allowing a claim for the negligent interference with

---

**2.** In *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Co.,* 42 Ohio St.3d 40, 45, 537 N.E.2d 624, 630–31 (1989), the Ohio Supreme Court also asserted similar policy concerns in excluding recovery in tort for economic losses:

In negligence, the law imposes upon the manufacturer of a product the duty of reasonable care. That duty protects the consumer from physical injury, whether to

person or property. However, the law of negligence does not extend the manufacturer's duty so far as to protect the consumer's economic expectations, for such protection would arise not under the law but rather solely by agreement of the parties. *Id.; see also, e.g., Cincinnati Gas & Elec. Co. v. Westinghouse Elec. Corp.,* No. 97–3962, 1998 U.S.App. LEXIS 21692, at 5, 1998 WL 661142 (6th Cir.1998).

prospective economic advantage despite the existence of solely economic losses brought by a lessee against a contractor only in privity with building's owner); *Ott v. Alfa-Laval Agri, Inc.*, 31 Cal.App.4th 1439, 1448, 37 Cal.Rptr.2d 790, 796–97 (finding that economic damages are recoverable in tort if a special relationship exists between the parties to give rise to a duty of care).

Alternatively, Plaintiffs contend that their damages go beyond the gas generator engine and extend throughout the turbine, bringing this case under the "damage to other property" exception to the economic loss doctrine noted in *ABB Power*, 902 F.Supp. at 1186, and the proposed Restatement (3d) of Torts: Products Liability § 21(c). Moreover, Plaintiffs argue that their implied warranty claims survive despite the economic loss doctrine.

In a supplemental reply brief (doc. 77), Chromizing disputes Plaintiff's assertion that Chromizing provided a "service" in refurbishing the blade. Chromizing initially points out that Plaintiffs allege strict liability and breach of implied warranty claims against Chromizing, claims that would not apply to defendants providing a service. *See Ferrari v. Grand Canyon Dories*, 32 Cal.App.4th 248, 258, 38 Cal. Rptr.2d 65, 71 (1995) (finding that courts do not extend the " 'doctrine of strict liability to transactions whose primary objective is obtaining services' "); *La Jolla Village Homeowners' Assoc. v. Superior Court*, 212 Cal.App.3d 1131, 1146, 261 Cal.Rptr. 146, 155 (1989) (finding that the " 'well settled rule in California is that where the primary objective of a transaction is to obtain services, the doctrines of implied warranty and strict liability do not apply' ").

Furthermore, Chromizing contends that it acted as a manufacturer in refurbishing the blades, arguing that "rebuilt" or "refurbished" products are "goods" for the purposes of warranty law and the economic loss doctrine under California law. *See* Cal.Comm.Code § 2105(1) (1999) (defining "goods" as "all things (including specially

manufactured goods) which are movable at the time of identification to the contract for sale ..."). According to Chromizing, the refurbishing of the blade for Plaintiffs required its employees to strip and remanufacture the coatings on the Stage 2 HPT blades. The Court notes that Cal.Civ. Code § 1738.12 defines a "manufacturer" as "any organization engaged in the business of producing, assembling, mining, weaving, importing or by any other method of fabrication, a product tangible or intangible, intended for resale to, or use by the consumers of this state" while Cal. Labor Code § 2650 states that "to manufacture" means "to make, process, prepare, alter, repair, or finish in whole or in part, or to assemble, inspect, wrap, or package any articles or materials." Chromizing asserts that its remanufacture of the coatings and general repair of the blades qualifies it as a manufacturer who supplied a "good" for Plaintiffs' use within the context of what was primarily a sales—and not service—transaction.

Additionally, Chromizing points out that the Fifth Circuit has refused to distinguish between new and refurbished products for the purposes of applying the economic loss doctrine. *Nathaniel Shipping, Inc. v. General Elec. Co., Inc.*, 932 F.2d 366, 369 n. 3 (5th Cir.1991). In *Nathaniel*, the Fifth Circuit declined to distinguish between services pursuant to the manufacture of a new vessel and services related to the repair of an existing vessel because the "public policy concerns underpinning tort duties are not present here, and the parties are capable of defining satisfactory performance and allocating the risk of defective performance in their contract."

Moreover, Chromizing avers that the Ninth Circuit in *ABB Power* rejected the reasoning of the *Ott* case and limited the holding in the *J'Aire* case in deciding when to apply the economic loss doctrine to parties not in direct privity. *See ABB Power*, 902 F.Supp. at 1189–90. Chromizing argues that the *J'Aire* and *Ott* cases are distinguishable from the instant litiga-

tion in that the *J'Aire* and *Ott* plaintiffs—unlike Plaintiffs in this case—were not sophisticated commercial parties who could have allocated their risks of loss in the original commercial transactions. Chromizing further notes that the *Ott* court specifically found that knowledgeable commercial buyers are in fact limited to remedies under the law of sales. *Ott,* 31 Cal.App.4th at 1453, 37 Cal.Rptr. at 800.

Finally, in reply to Plaintiffs' argument that Plaintiffs sustained damage to "other property," namely the power turbine, Chromizing asserts that the turbine is part of an "integrated package" containing the gas generator engine and its hot section and that no damage outside this integrated package occurred. *See East River S.S. Corp.,* 476 U.S. at 867, 106 S.Ct. 2295 (finding that a turbine engine and all its component parts represented "a single unit"). Chromizing contends that other state and federal courts have found that damage to an engine caused by component parts, as is alleged in this case, is not damage to separate property. In *American Universal Ins. Group v. General Motors Corp.,* 578 So.2d 451 (Fla.App.1991), a replacement oil pump allegedly malfunctioned and burned up the entire engine. The Florida court rejected the plaintiff's argument that the oil pump was the defective "product" and the rest of the engine was "other property." The court stated:

> It is our view that the oil pump was an integral or component part of the engine manufactured by General Motors and thus the damage to the engine caused by this component part was not damage to separate property.

*Id.* at 453 (citing *East River S.S. Corp.,* 476 U.S. at 867, 106 S.Ct. 2295). Moreover, in *Midwhey Powder Co. v. Clayton Indus.,* 157 Wis.2d 585, 590–91, 460 N.W.2d 426, 429 (1990), the Wisconsin Supreme Court held that gas generators and turbines used to generate power form an integrated unit so that damage to a turbine allegedly caused by a generator is not damage to "other property."

The Sixth Circuit, applying Michigan law, recognized the principle that only property damage that is impossible to foresee at the time a bargain is struck can be regarded as "other property" for purposes of the economic loss doctrine. *Detroit Edison Co. v. NABCO, Inc.,* 35 F.3d 236, 241–242 (6th Cir.1994) (affirming summary judgment based on the economic loss doctrine). Chromizing points out that, during the April 27, 1999 hearing, Plaintiffs conceded that damage to a turbine caused by a broken Stage 2 HPT blade would be foreseeable. Finally, Chromizing argues that the Third and Eighth Circuit Courts of Appeals recently denied recovery to a plaintiff who sought recovery for damages to an engine caused by a replacement part. *Sea–Land Serv., Inc. v. General Elec. Co.,* 134 F.3d 149, 153–54 (3d Cir.1998); *see also American Home Assur. Co. v. Major Tool & Mach., Inc.,* 767 F.2d 446, 448 (8th Cir.1985) (finding that the entire turbine was a "single product fabricated under a series of subcontracts").

The Court finds persuasive the arguments by Chromizing that Plaintiffs' negligence, strict liability, and implied warranty claims are barred by the economic loss doctrine. The Parties to this action are sophisticated entities who dealt with each other in a commercial setting from positions of relatively equal economic power. *See Kaiser,* 55 Cal.App.3d at 748, 127 Cal. Rptr. at 845. The Parties accepted certain risks and bargained for certain protections. The 1993 Purchase Agreement provided that Kvaerner could subcontract work on Spare Engine 691–025, an engine to include an old, refurbished hot section. The 1993 Agreement provided certain warranties covering the allegedly defective blade at issue in this case. Conceivably, Plaintiffs could have also sought warranties from subcontractors such as Chromizing while the transaction was ongoing. As conceded by Plaintiffs in the April 27, 1999 hearing, the damage caused by the Stage 2 HPT blade was foreseeable and, thus, was within the contemplation of these commercial Parties.

Moreover, the Court finds that the damage sustained by Plaintiffs due to the broken Stage 2 HPT blade extended throughout an integrated engine package and we reject Plaintiffs' argument that the turbine constituted "other property." In addition, while the Court finds that, by stripping and remanufacturing the coatings on the Stage 2 HPT blades, Chromizing acted as a manufacturer, we also note that the distinction is unnecessary in this case. When the sale of a product dominates the contractual dealings of sophisticated commercial parties, incidental services do not alter the basic transaction. *See RRX Indus., Inc. v. Lab–Con, Inc.,* 772 F.2d 543, 546 (9th Cir.1985); *see also Dakota Gasification Co. v. Pascoe Bldg. Systems, a Div. of Amcord, Inc.,* 91 F.3d 1094, 1097–98 (8th Cir.1996). In this case, the 1993 Purchase Agreement covered the sale of Spare Engine 691–025 and provided a warranty for the refurbishment of the old hot section from Engine 481–615. In sum, Plaintiffs' claims in this case are better addressed by the laws of contract and warranty, *see Seely,* 63 Cal.2d at 17–18, 45 Cal.Rptr. 17, 403 P.2d 145, and, as the Court held in Section I, these claims are barred by the limitation of actions provision in the 1993 Purchase Agreement. Accordingly, the Court hereby GRANTS Defendant Chromizing's Motion for Summary Judgment.

### III. Third–Party Defendant's Motion for Leave to File Motion to Dismiss or Sever

On November 5, 1998, this Court granted Defendant Chromizing leave to file a third-party complaint against GE (doc. 46). Chromizing filed the third-party complaint on November 12, 1998 (doc. 47), and GE filed an answer on December 7, 1998 (doc. 51). Third–Party Defendant GE now seeks leave to file a motion to dismiss for failure to state a claim upon which relief may be granted, or, alternatively, a motion to sever.

In support of the motion, Third–Party Defendant GE alleges that no direct privity of contract or other course of dealing exists between Plaintiffs or Defendants and GE regarding sale, resale, service, maintenance, warranty work, repairs, or supply of replacement parts and Third–Party Defendant GE contends that the derivative third-party claims against GE for contribution, indemnification, or spoliation are not viable as a matter of law.

Without examining the merits of Third–Party Defendant GE's motion, this Court concludes that any right of recovery as against Third–Party Defendant GE is only derivative of the tort claims brought against Defendant Chromizing by Plaintiffs. Therefore, since this Court is granting Defendant Chromizing's Motion for Summary Judgment and dismissing Plaintiffs' tort claims against Chromizing, no cause of action can remain as between Third–Party Plaintiff Chromizing and Third–Party Defendant GE. In other words, no derivative third-party liability remains after the dismissal of the original claims. Accordingly, we hereby DENY AS MOOT Third–Party Defendant GE's motion for leave to file a motion to dismiss and sever.

### CONCLUSION

For the foregoing reasons, we hereby GRANT Defendants' Motions for Summary Judgment, DENY AS MOOT Third–Party Defendant's Motion for Leave to File Motion to Dismiss and Sever, and DISMISS Plaintiffs' claims against Defendants, Defendant Kvaerner's cross-claims against Defendant Chromizing, and Defendant Chromizing's third-party claims against Third–Party Defendant GE.

SO ORDERED.