ALCAN ALUMINUM CORP., Plaintiff,

v.

BASF CORP. d/b/a Delaware New Corp., Defendant.

Civil Action No. 3:97–CV–1480–L.

United States District Court, N.D. Texas, Dallas Division.

Jan. 30, 2001.

---

Robbie Malone, R. Scott Seifert, Nelson S. Ebaugh, Hiersche, Martens, Hayward, Drakeley & Urbach, P.C., Addison, TX, for Plaintiff.

Earl B. Austin, Tyler L. Murray, Baker Botts, L.L.P., Dallas, James M. Hall, Jr., Taft, Stettinius & Hollister, Cincinnati, OH, for Defendant.

## MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

Before the court are Defendant's Motion for Summary Judgment, filed April 23, 1998; Plaintiff's Motion to Cure Evidentiary Defects, filed April 13, 2000; and Defendant's Motion to Supplement Summary Judgment Authorities, filed May 3, 2000. After careful consideration of the motions, responses, replies, briefs, evidence submitted by the parties and applicable law, the court **grants** Plaintiff's Motion to Cure Evidentiary Defects, **denies as moot** Defendant's Motion to Supplement Summary Judgment Authorities, and **grants in part**

**488**

and **denies in part** Defendant's Motion for Summary Judgment.

### I. *Factual and Procedural Background* [1]

Plaintiff Alcan Aluminum Corporation ("Alcan"), among other business activities, manufactures aluminum-based panels for gasoline station fascia and sun rooms, in which areas the panels can be subjected to extreme heat. Urethane foam is placed into the final manufactured products as an insulator. The foam is sprayed into the aluminum shells as a liquid; as it cures, it expands and hardens to create a rigid core. Alcan, for some time prior to the events giving rise to this action, used an "Autofroth 8262" system offered by Defendant BASF Corporation ("BASF") or its corporate predecessor. The system consisted of two different chemical components and a mixing gun; the chemicals were mixed in a specific ratio to create the foam. BASF also provided engineering and technical support for its system.

As a result of environmental concerns about the chlorofluorocarbon ("CFC") "blowing agent" in use prior to July 1993, and tariffs imposed on CFC foams by the Environmental Protection Agency, BASF and Alcan agreed on a replacement system, Autofroth 9206, which Alcan used in its manufacturing process from July 1993 until September 1994. Autofroth 9206 used a blowing agent designated R–22, at the time the only such blowing agent available for use in non-CFC systems. The process is complex, and temperature or timing deviations can lead to defective foam; quality control procedures were implemented to ensure adherence to processing parameters. Autofroth 9206 had narrower process parameters than the Autofroth 8262 system and required modification of Alcan's manufacturing process.

Alcan started receiving complaints, and warranty claims, from customers in the spring of 1994 about "bubbling" and deformation in panels constructed using Autofroth 9206. Alcan sought assistance from BASF in determining the cause of the bubbles, but did not conclusively determine the cause at that time. Alcan does not dispute that the chemical components themselves met quality control specifications and were delivered in proper condition. Other customers of BASF, using non-CFC Autofroth systems other than 9206, have also experienced bubbling problems in their products. BASF offered a replacement product, Autofroth 9313, which Alcan tested and then began using in September 1994, with the same manufacturing process and quality control procedures as it had used for Autofroth 9206. The bubbling problem ceased after Alcan began manufacturing panels using the Autofroth 9313 system.

By letter to BASF dated December 16, 1994, Alcan claimed that the bubble problems were a direct result of the change to the Autofroth 9206 system, and requested reimbursement for warranty claims from customers and other expenses incurred. On May 16, 1997, Alcan filed this lawsuit. The parties dispute the actual cause of the bubbling problem. Alcan asserts that the Autofroth 9206 system was defective, in that the formula contained too much R–22, which created excessive gas pressure in the cell structure of the polymer matrix, particularly when subjected to extreme temperatures. BASF disputes the validity of the conclusions of Alcan's experts as to excessive gas pressure, and also asserts that the bubbling problem was likely caused by Alcan's misuse of the system. As a contributing factor to such alleged misuse, BASF claims that Alcan's quality control procedures were inadequate to detect and prevent failures to comply with appropriate processing parameters. The parties also dispute what processing parameters were appropriate.

1. The facts contained herein are either undisputed or, where they are disputed, presented in the light most favorable to Plaintiff as the nonmovant.

Alcan filed suit against BASF in state court on May 16, 1997, and BASF removed to this court on June 18, 1997. Alcan asserts causes of action for: 1) breach of contract; 2) breach of warranty; 3) fraud and/or fraudulent concealment; 4) negligent misrepresentation; 5) violation of the Texas Deceptive Trade Practices—Consumer Protection Act ("DTPA"), Tex. Bus. & Comm.Code Ann. § 17.41 *et seq.* (West 1987 & Supp.2001); and 6) professional negligence.[2] Alcan seeks damages, exemplary damages, costs, and attorneys' fees. BASF denies Alcan's claims and also asserts in the alternative various affirmative defenses including, among others, statute of limitations, waiver and estoppel, contributory negligence, failure to mitigate, spoliation of material evidence, ratification, and unclean hands.

BASF also asserts that Alcan, a business entity with assets of $25 million or more, is not entitled to bring suit under the DTPA based on Tex. Bus. & Comm. Code Ann. § 17.45(4, 10). In addition to advancing this as a defense against Alcan's DTPA claim, BASF makes a counter-claim against Alcan for filing a groundless DTPA claim in bad faith.[3] BASF seeks to recover attorneys' fees and expenses, as well as any other damages caused by the claim. Alcan denies that the DTPA claim was brought in bad faith, and also asserts an affirmative defense that the DTPA exclusion from coverage of business consumers with assets of $25 million or more, upon which BASF relies for its conclusion that Alcan lacks legal standing for the DTPA claim, violates the Equal Protection clauses of the Texas and United States Constitutions.

## II. *Summary Judgment Standard*

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Ragas,* 136 F.3d at 458.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527,

2. Alcan also asserts a cause of action for declaratory judgment as to the existence of a contract between Alcan and BASF, and Alcan's rights and BASF's obligations under such contract. The court concludes this is subsumed within Alcan's causes of action for breach of contract and breach of warranty; Alcan has asserted no other basis for this constituting an actual controversy.

3. "On a finding by the court that an action under this section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment, the court shall award to the defendant reasonable and necessary attorneys' fees and court costs." Tex. Bus. & Comm.Code Ann. § 17.50(c) (West Supp. 2001).

1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas,* 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.,see also Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### III. *Procedural Motions*

■ Alcan's motion seeks to cure certain defects, as pointed out by BASF, in some of its summary judgment evidence. BASF opposes Alcan's motion because: 1) the attempted "cures" are inadequate to make the evidence admissible; 2) the evidence is still insufficient to preclude summary judgment; and 3) in the instance of "other business records" attached to an affidavit by John Ahlfors, the "cure" constitutes new evidence not included in Alcan's original summary judgment response. Although Alcan's motion was filed nearly two years after its response to the motion for summary judgment, the court concludes that the materials submitted may aid the court in making its determinations and therefore should be considered.

BASF's third argument is simply wrong. All of the alleged "new evidence" was included in Alcan's previous response to the summary judgment motion. BASF's first two arguments also are insufficient grounds for denying Alcan's motion. The possibility that Alcan's evidence will still be inadmissible or will be insufficient to defeat the motion for summary judgment does not mean that Alcan should not be allowed to try. The court also is not inclined to evaluate the admissibility of evidence unless needed. Often, the challenged items of evidence will not affect the court's determination of the issues, and a resolution of admissibility will be unnecessary. Now that BASF has properly communicated its concerns about admissibility, the court can determine whether the evidence should be considered in making its rulings. The court therefore grants Alcan's motion and will consider the materials provided as necessary in evaluating whether Alcan's previously submitted summary judgment evidence is admissible and competent. Further, the court will exclude the summary judgment evidence of both parties *sua sponte* where necessary (because the evidence would affect the court's ruling) and appropriate (because the evidence is not properly before the court). If Alcan's summary judgment evidence is still inadmissible, not competent according to Fed.R.Civ.P. 56, or insufficient to defeat the motion for summary judgment, the court will rule accordingly.

BASF's motion seeks to bring to the court's attention three cases, decided after the submission of briefs on the summary judgment motion, addressing the admissibility of expert testimony under the standard in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). BASF, in its motion, and Alcan, in its response, argue the application of these cases to this controversy. The supplemental authorities in question are a Supreme Court case and two published Fifth Circuit cases—*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Munoz v.*

*Orr,* 200 F.3d 291 (5th Cir.2000); *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269 (5th Cir.1998). The court independently identified these cases in the course of its research, and discusses two of them in the analysis below. The court therefore **denies as moot** BASF's motion.

■ The court further notes that it appreciates the parties' desires to facilitate an informed ruling, but wishes to discourage additional filings beyond the motion, response, and reply without compelling reasons or exceptional circumstances. For example, a sur-reply might be appropriate to bring to the court's attention new authorities that make drastic changes in the law likely to change the court's determination *and* that the court is likely to miss in its research, or might find only with difficulty and significant effort. That is not the case with these three opinions.

## IV. *Motion for Summary Judgment*

BASF raises several arguments for summary judgment including, among others, the following: that Alcan's claims are barred by applicable statutes of limitations; that Alcan lacks standing under the DTPA; that Alcan's injuries were caused by quality control problems rather than the Autofroth 9206 system; that BASF either did not make or disclaimed any warranties; that BASF made no representations upon which Alcan relied; and that Alcan cannot recover under tort theories, as opposed to contract theories, for the injuries alleged.

### A. *Breach of Contract Claim*

■ Alcan asserts a cause of action based on BASF's alleged breach of their contract, in that the component parts failed to conform to the contract description. "The essential elements in a suit for breach of contract are: (1) the existence of a valid contract; (2) that the plaintiff performed or tendered performance; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged as a result of the breach." *Southwell v. Uni-versity of the Incarnate Word,* 974 S.W.2d 351, 354–55 (Tex.App.1998, pet. denied). BASF attacks the fourth element, arguing that Alcan has no competent summary judgment evidence that the Autofroth 9206 system was the cause of the defective panels.

The parties present two competing explanations for the damaged panels. Alcan asserts that excessive gas pressure in the foam, caused by high levels of R–22 in the system and exacerbated by high temperatures, ruptured the cells in the polymer matrix. BASF claims that the damage to the panels was caused by Alcan's failure to follow the process parameters and use adequate quality control measures. Because BASF seeks summary judgment, the court must determine whether Alcan has submitted sufficient competent summary judgment evidence to establish a genuine issue of material fact whether the Autofroth 9206 system itself caused the defects.

■ Alcan relies on reports by two experts, Dr. Raymond Flumerfelt and Dr. Wayne Britton, for its evidence of causation. BASF contends that these reports do not satisfy the standard for expert testimony established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In evaluating the admissibility of expert testimony, the key factors are reliability and relevance. *Id.* at 589, 113 S.Ct. 2786. The relevance of the reports by Drs. Flumerfelt and Britton is obvious and uncontested, as are their qualifications. BASF challenges the reliability of their conclusions.

The analysis by Drs. Flumerfelt and Britton may be summarized as follows. Compared to the polymer structure generated by Autofroth 9313, the structure generated by Autofroth 9206 is more dense and contains substantially more dissolved $CO_2$ and R–22 gases. The structure is not completely solid, but contains empty spaces ("cells"). The cell structure of both polymers is closed (cells completely enclosed by polymer films) rather than open

(open channels between adjacent cells). Under the conditions tested, the internal gas pressure in the 9206 foam cells is more than twice that in the 9313 foam cells. The amount of dissolved gases that the polymer contains declines as temperatures rise, causing the gas to be released from the polymer itself to the cell matrix. For example, in a typical $8' \times 3' \times 4''$ panel, an increase in temperature from 77° Fahrenheit to 130° Fahrenheit would result in releasing more than 1.3 cubic feet of gas, more than 16% of the total volume of the panel.

■ Up through this point, BASF has only relatively minor quibbles with the experts' analysis. BASF points out a mathematical error in the calculations, but Dr. Britton in his deposition pointed out that the same error occurred not only in the calculations for the 9206 polymer but also in the calculations for the 9313 polymer.[4] The *relative* comparison between the two polymers therefore would not necessarily be significantly changed. BASF also disputes the assumed error rate in the panels, calculating a 15% error rate compared to

Alcan's calculation of a 90–95% error rate.[5] Based on a review of the summary judgment evidence submitted, the court concludes that there is a genuine issue of material fact as to the error rate. The court is satisfied that neither of these challenges compels a conclusion that the expert testimony is unreliable.

BASF's primary challenge to the reliability of the expert opinions lies not with the analysis discussed above, but with their final step—the conclusion that the higher (relative to the 9313 polymer which did not experience the bubbling problem) internal gas pressure probably ruptured the cell walls in the polymer matrix and created the bubbles in the panels. As BASF points out, whether cell walls were ruptured by the internal gas pressure depends on two different factors, the amount of the pressure and the strength of the cell walls. Alcan's experts calculated only the first factor; there is no known method for calculating the capability of a polymer matrix to contain internal gas pressure. There is, therefore, no way to conclusively

---

4. Defendant's Summary Judgment Brief at 10; Plaintiff's Appendix, Exhibit N at 248. The error in question concerns the calculation of the amount of R–22 in the combined foam. The foam is created by mixing two component streams, each of which has a different percentage of R–22. The experts calculated the percentage of R–22 in the combined foam by adding, rather than averaging, the percentages in the two component streams. In Autofroth 9206, R–22 made up 25% of the resin stream by weight and 10% of the isocyanate stream by weight. The experts' calculations assumed that the combined foam contained 35% R–22, rather than (assuming equal weight of the two streams) 17.5% R–22. The same error, though, applied to the other system to which the experts compared Autofroth 9206. In Autofroth 9313, R–22 made up 20% of the resin stream by weight and 0% of the isocyanate stream by weight. The experts' calculations assumed that the combined 9313 foam contained 20% R–22, rather than (again assuming equal weight of the two streams) 10% R–22. *See* Plaintiff's Appendix, Exhibit H at 7–8. Since the experts' conclusions were based on a *relative* comparison between the two polymers, the effect of the error may be negligible.

5. BASF relies on a chemical engineer expert, who calculated a 10–15% error rate based on the number of defects (noted in Alcan's warranty files) and the volume of 9206 components shipped to Alcan by BASF (from BASF's shipping invoices); the specific calculations are not presented. Defendant's Appendix, Exhibit 8 (Affidavit of Kenneth Baker) ¶ 19. Alcan's figure of 90–95% is based on personal observation by its Quality Control Manager at the time. Plaintiff's Appendix, Exhibit G (Affidavit of Lori Riggs) ¶ 8. Ms. Riggs personally inspected panels returned to the plant for warranty claims. *Id.* Her affidavit further states that Alcan did not experience similar problems while using Autofroth 8262 or Autofroth 9313. *Id.* ¶ 9. The court concludes as a preliminary matter that the evidence proffered by both parties constitutes competent summary judgment evidence. Alcan may, of course, challenge Mr. Baker's testimony prior to trial, under the standard for expert testimony established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

determine whether the internal gas pressure calculated for the 9206 polymer was "excessive." Accordingly, BASF contends that Alcan has not, and cannot, prove that the higher levels of internal gas pressure (relative to the 9313 polymer) *caused* the bubbling problem.

■ Proposed expert testimony need not be considered, for purposes of *Daubert* analysis, as a monolithic whole; it is certainly possible to analyze separately and reach separate conclusions concerning the bulk of an expert's analysis and the final conclusion which he reaches. *See, e.g., Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 273 (5th Cir.1998) (permitting doctor to testify about "his examination of [the plaintiff], the tests he conducted, and the diagnosis he reached" but not about "his opinion that the Toluene solution caused" the plaintiff's injuries). Particularly where much of the expert's testimony seems unobjectionable, the court concludes that such an approach is appropriate.

■ The court is not, however, convinced that a final determination of admissibility under the *Daubert* standard should be made at this point. Courts need not, and perhaps often should not, apply *Daubert* at the summary judgment stage.

> The fact that *Daubert* can be used in connection with summary judgment motions does not mean that it should be used profligately. A trial setting normally will provide the best operating environment for the triage which *Daubert* demands.... Because the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage.

*Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d 184, 188 (1st Cir.1997); *see also Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412, 417–18 (3d Cir.1999). The complex procedures required to effectively apply *Daubert* at the summary judgment stage may outweigh the benefits. *See*

*Cortes–Irizarry,* 111 F.3d at 188 n. 3. The primary concern is "affording the proponent of the evidence adequate opportunity to defend its admissibility" before excluding it. *Id.* at 188. The clear implication is that courts should be more careful about excluding testimony than including testimony at the summary judgment stage. Although the Fifth Circuit has not addressed this issue, the court is persuaded by the reasoning of the First and Third Circuits and adopts it. At this point, the court will conduct only a preliminary review, in order to determine whether to consider the expert testimony for purposes of the summary judgment motion.

■ The court first reviews the scientific validity of the experts' analysis of the amount of dissolved gases in the polymers, internal gas pressures, and the release of dissolved gases under high temperatures. *Daubert* established

> a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the methodology is scientifically valid or reliable. These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore,* 151 F.3d at 275 (citing *Daubert,* 509 U.S. at 593–95, 113 S.Ct. 2786). Although the parties did not explicitly address these factors with reference to this portion of the analysis, the court concludes that the analysis almost certainly satisfies the *Daubert* test. The court is far from an expert in chemical engineering, but the experts' methodology as described in their reports appears to "based on fundamental principals [sic] of science," *see* Plaintiff's Response Brief at 9, that have been tested and validated, and are generally accepted.

The court does not make a final determination as to the admissibility of this evidence, but concludes that it may properly be considered for purposes of the motion for summary judgment.

The conclusion that the experts reach from these results—that the "excessive" gas pressure was the cause of the bubbling problem—is another matter. BASF rightly points out that such a cause-and-effect relationship has not been scientifically demonstrated, and probably cannot be if (as the parties seem to agree) there are no methods of determining the strength of the polymer matrix and its ability to withstand pressure. Courts often establish extremely rigorous standards for the admission of causation evidence. For example, "[t]he 'strong' version [of medical causation] requires a plaintiff to offer both epidemiological evidence that the probability of causation exceeds fifty percent in the exposed population and 'particularistic' proof that the substance harmed the individual.... [It may be necessary] to rule out the myriad other possible causes [of the disease.]" *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 715 (Tex.1997) (citations and internal quotation marks omitted); *see id.* at 714–20 (discussing different courts' approaches to requiring evidence of medical causation). Under such standards, the experts' final conclusion in this case may well fail the test of reliability.[6]

The court needs not, however, and therefore does not reach the issue of whether the experts' final conclusion may be considered for purposes of summary judgment. At issue is whether Alcan has established a genuine issue of material fact as to the causation of the injuries. The court concludes that, even without the experts' final conclusion, Alcan has met that burden. The experts' intermediate conclusions (that Autofroth 9206 contained more than twice the internal gas pressure, and substantially more gas dissolved in the polymer, than Autofroth 9313) coupled with higher failure rates for panels manufactured with Autofroth 9206 than those manufactured with Autofroth 9313,[7] if believed by the jury, clearly would be enough that a reasonable juror *could* conclude that the higher gas pressure caused the higher failure rates. BASF is correct that this circumstantial evidence is insufficient to conclusively prove causation and, with or without the weight of the experts' final conclusion as to causation, it may be insufficient to win at trial, but it sufficiently raises a fact question to defeat summary judgment.

Because the court concludes that Alcan has established a genuine issue of material fact as to causation, the sole ground advanced by BASF against the breach of contract claim,[8] judgment as a matter of

6. On the other hand, *Daubert* challenges to causation evidence frequently occur in the context of medical causation, as did *Daubert* itself. The court is not entirely convinced that tests of the rigor described in *Havner* are necessarily appropriate in other contexts. Determining the cause of human disease in cases such as *Daubert* and *Havner* is particularly difficult. The interaction between the human body and various environmental factors is incredibly complex, and there are a large number of possible causes the effects of which may be extremely difficult to isolate and validate, not to mention limitations due to ethical concerns prohibiting direct experimentation in some instances. The resulting uncertainty encourages the assertion of myriad causal factors based on little more than an expert's subjective opinion, requiring the court's most diligent exercise of its gatekeep-ing function. *Daubert* applies to all expert knowledge, not just "scientific," of course, and certainly is not limited to questions of medical causation. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The level of rigor required for acceptable proof, however, might be less in cases such as this than that suggested in *Havner*.

7. As noted above, this is disputed but Alcan has demonstrated a genuine issue of material fact as to the error rate for Autofroth 9206.

8. In its challenge to the breach of warranty claim, BASF asserts that "Alcan's breach of contract claim is indistinguishable from Alcan's warranty claims." Defendant's Brief in Support of Motion for Summary Judgment at

law is denied as to this claim. BASF may, of course, reurge its *Daubert* challenge to the testimony of Alcan's experts prior to trial.

### B. *Breach of Warranty Claim*

■ Alcan alleges that the Autofroth 9206 system failed to conform to BASF's warranties, including express warranty and implied warranties of fitness for a particular purpose and merchantability.

In order to recover for the breach of an express warranty, a plaintiff must prove: (1) an express affirmation of fact or promise by the seller relating to the goods; (2) that such affirmation of fact or promise became a part of the basis of the bargain; (3) that the plaintiff relied upon said affirmation of fact or promise; (4) that the goods failed to comply with the affirmations of fact or promise; (5) that the plaintiff was injured by such failure of the product to comply with the express warranty; and (6) that such failure was the proximate cause of plaintiff's injury.

*Morris v. Adolph Coors Co.,* 735 S.W.2d 578, 587 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.). "Unless excluded or modified (Section 2.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Tex. Bus. & Com.Code Ann. § 2.314(a) (West 1994).

Goods to be merchantable must be at least such as (1) pass without objection in the trade under the contract description; and (2) in the case of fungible goods, are of fair average quality within the description; and (3) are fit for the ordinary purposes for which such goods are used; and (4) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;

and (5) are adequately contained, packaged, and labeled as the agreement may require; and (6) conform to the promises or affirmations of fact made on the container or label if any.

*Id.* § 2.314(b). "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." *Id.* § 2.315. BASF denies any express or implied warranties, and asserts that Alcan's misuse of the product would bar recovery for any breach of warranty.

Alcan alleges that BASF made express warranties by means of pre-printed language on Alcan's purchase order for the Autofroth 9206, as follows:

Vendor expressly warrants that all of the materials or equipment sold to Purchaser under this Order shall comply with applicable specifications, drawings, standards, samples or other descriptions furnished or specified by Vendor or Purchaser, will be free from defects in material and workmanship, will be merchantable and will be suitable and fit for particular purposes for which such goods are required by Purchaser.

*See* Plaintiff's Appendix, Exhibit EE. Alcan further alleges that implied warranties of merchantability and fitness for a particular purpose arose by operation of law.

BASF denies ever receiving the purchase order with a written warranty, and also alleges that it disclaimed all warranties in its Terms and Conditions of Sale sent to Alcan: "NOTHING HEREIN SHALL BE DEEMED TO CONSTITUTE A WARRANTY, EXPRESS OR IMPLIED, THAT SAID INFORMATION OR DATA ARE CORRECT OR THAT

---

14. While this may be so, the argument is not sufficiently developed or adequately supported, and the court therefore does not consider it as a further ground for summary judgment on the breach of contract claim. BASF may, of course, make this argument at trial.

THE PRODUCTS DESCRIBED ARE MERCHANTABLE OR FIT FOR A PARTICULAR PURPOSE ...." *See* Defendant's Appendix, Exhibit 18, Attachment A. On the back side of the Terms and Conditions of Sale is a further disclaimer, under the first item:

> 1. WARRANTIES. Seller warrants that (a) the product is of the quality set forth in Seller's published specifications, if any, or as may be otherwise expressly stated in the contract, and (b) the title conveyed is good and the product is free from any lawful security interest, lien or encumbrance. SELLER MAKES NO FURTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR OTHERWISE.

*Id.* BASF also alleges that it disclaimed warranties through a notation on the bottom of its Preliminary Product Data Sheet, which read:

> Important: The information, data and products presented herein are based upon information reasonably available to BASF Corporation at the time of publication and are presented in good faith, but are not to be construed as guarantees or warranties express or · implied, regarding performance results to be obtained from use, comprehensiveness, merchantability, . . . .

*See id.,* Exhibit 8, Attachment B. BASF contends that these disclaimers effectively disclaimed express and limited warranties upon which Alcan bases its claim.

Alcan denies receiving the "terms and conditions" on the Data Sheet, and contends that in any event the purchase order predated the Data Sheet and therefore cannot be modified by it, per Tex. Bus. & Comm.Code Ann. § 2.207 (West Supp. 2001). Alcan further contends that the disclaimer does not meet the requirement that any disclaimer of the implied warranties of fitness for a particular purpose and merchantability be conspicuous. *See id.* § 2.316(b). In turn, BASF contends that recovery for breach of warranties is precluded by Alcan's misuse of the product and failure to provide evidence of defect.

■ After reviewing the summary judgment evidence, the court concludes that Alcan has not established a genuine issue of material fact as to the existence of an express warranty based on the language on the back of its purchase order. BASF points to a deposition of Alcan's purchasing manager stating that purchase orders were not always sent to vendors, *see* Defendant's Appendix, Exhibit 2 at 125, 127–29, 132–33,[9] and an affidavit by BASF's Business Manager of the Urethane Specialities Group stating that he did not recall ever receiving any purchase order or other document from Alcan that set forth terms of sale or purported to impose any express warranties. *See id.,* Exhibit 18. Yet, despite BASF's challenge, Alcan has failed to provide *any* competent summary judgment evidence that explicitly indicates that its purchase orders were, or routinely would have been in the ordinary course of business, sent to BASF. Neither has it refuted the testimony provided by its Purchasing Manager.

In its Motion to Cure Evidentiary Defects, Alcan provided an affidavit by its Controller, who stated that the "conditions of order" upon which Alcan relies "was used during the Relevant Period by Alcan Building Products, Inc. to purchase the Autofroth 9206 foam from BASF Corporation." *See* Plaintiff's Motion to Cure Evidentiary Defects, Exhibit D. Saying that Alcan *used* the purchase order, however, is a far cry from saying that Alcan *sent* the purchase orders to BASF. Alcan's failure to squarely address the challenge clearly raised by BASF is puzzling, and the court can only infer that Alcan is unable to

---

9. The deposition testimony seems to indicate that one circumstance under which a copy of the purchase order might well not have been sent to the vendor would be for phone orders.

BASF also points to the nine purchase orders for Alcan's purchase of Autofroth 9206, all of which show the normal indicia of a phone order. Defendant's Appendix, Exhibit 16.

provide satisfactory evidence. Accordingly, the court concludes that Alcan has not established a genuine issue of material fact as to the existence of an express warranty, and BASF is entitled to judgment as a matter of law with respect to that claim.

█ Although Alcan's purchase orders did not expressly establish warranties of merchantability and fitness for a particular purpose, such warranties may be implied in certain circumstances. Tex. Bus. & Comm.Code Ann. §§ 2.314, 2.315. Such implied warranties can also be expressly disclaimed, however. *Id.* § 2.316. Such disclaimers must be in writing and conspicuous. *Id.*

A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: Non–Negotiable Bill of Lading) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color.... Whether a term or clause is "conspicuous" or not is for decision by the court.

*Id.* § 1.201(10); *see also id.* § 1.201, comment 10: "This is intended to indicate some of the methods of making a term attention-calling. But the test is whether attention can reasonably be expected to be

called to it." This is an objective, rather than subjective, standard to be determined by the court as a question of law. *Cate v. Dover Corp.,* 790 S.W.2d 559, 560 (Tex. 1990).

BASF has alleged exactly such disclaimers, on its Terms and Conditions of Sale document and the Preliminary Product Data Sheet. BASF has also provided competent summary judgment evidence supporting Alcan's receipt of such.[10] Alcan admits receiving the Data Sheet, but denies receipt of any terms and conditions on it. No summary judgment evidence is offered, however, to dispute the receipt of the terms and conditions. Alcan's response fails to even address the Terms and Conditions of Sale document.

█ Based on its review of the documents in question, the court concludes as a matter of law that the disclaimer on the Data Sheet was not conspicuous and does not satisfy the requirements of Tex. Bus. & Comm.Code Ann. §§ 1.201(10), 2.316(b). The disclaimer is printed at the bottom of the page, is in substantially smaller print than the bulk of the document, and does not use a different font or color, bold, or capital letters. In the copy provided in BASF's appendix, it is barely legible, let alone "so written that a reasonable person against whom it is to operate ought to have noticed it." As such, this particular

10. *See* Defendant's Appendix, Exhibit 18 (receipt of Terms and Conditions of Sale). This is an affidavit by BASF's Business Manager of the Urethane Specialities Group, in which he states that BASF "routinely issues these terms and conditions when the customer first purchases a product, when a price change is imposed, and when the customer changes to a different product." *Id.* ¶ 4. "Under BASF's customary practices, Alcan would have received BASF's standard terms and conditions, including the disclaimer of warranty. I have no reason to believe that Alcan did not in fact receive these terms and conditions in this transaction." *Id.* ¶ 5. This constitutes a stronger and more positive statement than that offered by Alcan to prove that the purchase order would have been received by BASF. Further, BASF provides summary judgment evidence by this affidavit that it did *not* receive the purchase order. *Id.* ¶ 3. Alcan

asserts in its response brief that it did not receive the Terms and Conditions of Sale, but offers no summary judgment evidence in support of this assertion.

For the receipt of the Preliminary Product Data sheet, see Defendant's Appendix, Exhibit 4 at 127–28. This is from the deposition of David Bailey, who confirmed receiving the sheet before Alcan began using Autofroth 9206. Mr. Bailey's position is not clearly indicated in the materials submitted by BASF, but in his deposition he stated "I would've had to have received [the Preliminary Product Data sheet] before to get the approvals for *us* to start using it." *Id.* at 128 (emphasis added). The court infers from this that Mr. Bailey was an employee of Alcan. Although the evidence that Alcan received the Preliminary Product Data sheet is somewhat ambiguous, in the end it is irrelevant as the court does not rely on the disclaimer on this document.

document is ineffective to disclaim implied warranties, if any, of merchantability and fitness for a particular purpose.

 The Terms and Conditions of Sale document is another matter. The disclaimer on the back of the document is included in the first numbered paragraph, and is the only material in capital letters on the back of the document other than the paragraph headers. The disclaimer on the front of the document is in slightly smaller type than the rest of that side of the document, but the paragraph is preceded with the word "Important" in bold lettering and the disclaimer itself is in capital letters, unlike the vast majority of the material on the front of the document. The court concludes as a matter of law that the disclaimers on the Terms and Conditions of Sale document are "conspicuous."

Because BASF has provided evidence that the Terms and Conditions of Sale document was received by Alcan, and Alcan has offered no evidence in dispute, and because the disclaimers on the document are conspicuous, the court concludes that BASF adequately disclaimed any implied warranties concerning the Autofroth 9206 system. As noted above, Alcan has not provided competent summary judgment evidence establishing the existence of any express warranty. Accordingly, Alcan has not established a genuine issue of material fact as to its breach of warranty (express or implied) claim, and BASF is entitled to judgment as a matter of law as to that claim. BASF also contends that implied warranties did not arise by operation of law, that Alcan misused the product and thereby barred recovery under any warranty, and that Alcan has no evidence of any defect that breached the warranty. Because of the court's rulings, it need not address these additional grounds for summary judgment on the breach of warranty claim.

## C. *Fraud and/or Fraudulent Concealment Claim*

 Alcan also asserts a cause of action based on fraud and/or fraudulent concealment, for material misrepresentations or omissions. The elements of fraud are:

> (1) a material misrepresentation was made; (2) it was false; (3) when the representation was made, the speaker knew it was false or the statement was recklessly asserted without any knowledge of its truth; (4) the speaker made the false representation with the intent that it be acted on by the other party; (5) the other party acted in reliance on the misrepresentation; and (6) the party suffered injury as a result.

*Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 442 n. 9 (Tex.App.—Houston [14th Dist.] 2000, pet. filed). Fraudulent concealment, as an affirmative cause of action rather than avoidance of a statute of limitation, has virtually identical elements:

> a. A party conceals or fails to disclose a material fact within the knowledge of that party, b. The party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, c. The party intends to induce the other party to take some action by concealing or failing to disclose the fact, and d. The other party suffers injury as a result of acting without knowledge of the undisclosed fact.

*Bradford v. Vento*, 997 S.W.2d 713, 724 (Tex.App.—Corpus Christi 1999, pet. granted) (quoting the jury charge, taken from the Texas Pattern Jury Charges). Fraud by nondisclosure also requires a finding that the defendant had a duty to disclose, which

> may arise in four situations: (1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier

representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression. *Id.* at 725. BASF challenges the fraud and/or fraudulent concealment claim, asserting that Alcan has no evidence of any misrepresentations/omissions by BASF, or reliance thereon by Alcan.[11]

Alcan asserts three representations by BASF upon which it relies: 1) that Autofroth 9206 was an adequate replacement for Autofroth 8262; 2) that BASF was taking all necessary steps to determine the cause of the problem; and 3) that Alcan should continue to use Autofroth 9206 during BASF's investigation of the problem. After a careful review of the summary judgment evidence offered by Alcan, the court concludes that Alcan has not established a genuine issue of material fact as to alleged misrepresentations by BASF upon which Alcan relied to its detriment.

■ The summary judgment evidence offered by Alcan for the first two alleged representations consists of a memorandum, dated January 13, 1995, from John H. Dickey (a Technical Service Manager for BASF) to Richard J. Rochefort (a Business Manager for BASF), James P. Duggan (then a Technical Service representative for BASF), Stephen W. Scott, Allan H. Syrop and Bruce Klein. *See* Plaintiff's Appendix, Exhibit V. The court finds it truly puzzling that Alcan would offer summary judgment evidence riddled with deficiencies. Alcan elsewhere identified this document as "an interoffice BASF memorandum," *see* Plaintiff's Response Brief at 17, and provides no evidence that these representations were made *to Alcan.* In addition, the memorandum is dated well after Alcan discontinued use of Autofroth 9206, and the court sees no way that Alcan could have relied on these representations in its use of the product. Finally, even if this represents evidence of misrepresentations by BASF, Alcan offers absolutely no evidence by affidavit or deposition excerpt that Alcan took any actions to its detriment in reliance on the memorandum, or even identifies any action taken in response to the memorandum. Accordingly, the first two misrepresentations alleged by Alcan are insufficient to establish a genuine issue of material fact as to Alcan's fraud claim.

■ The third misrepresentation alleged by Alcan is that BASF advised Alcan that it should continue to use Autofroth 9206 during BASF's investigation of the problem. Alcan allegedly relied on that representation by purchasing additional chemicals. In support of this allegation, Alcan offers excerpts from a deposition by Mr. David Bailey, whose position is not identified but who apparently worked for Alcan.[12]

■ Whether this advice by BASF would constitute a *representation* is not entirely clear. A recommendation is not normally thought of as a statement about a *fact.* If this is construed as a prediction or opinion that the bubbling problem would disappear if Alcan continued to use Auto-

---

**11.** BASF also argues that Alcan has no evidence that the alleged misrepresentations caused Alcan's injuries, due to alleged misuse of the product, and that any reliance on the alleged misrepresentations was not justified. These arguments, however, are raised for the first time in the reply brief and "parties may not raise new grounds for summary judgment in their reply brief," *Lovell v. Glen Oaks Hosp., Inc.*, 1998 WL 417774, at *4 n. 4 (N.D.Tex. July 21, 1998). The court therefore will not consider these arguments.

**12.** Plaintiff's Appendix, Exhibit T at 108–110. In response to a question by Alcan's employees whether they should continue to making panels using Autofroth 9206, the gist of BASF's response was "We see no reason for you to stop production," that is, they had not determined the cause of the bubble problem at that point. Alcan also offers an affidavit by its Quality Control Manager, *see id.*, Exhibit G, ¶ 11, to similar effect. Alcan subsequently conceded that this statement constituted hearsay and therefore would not be admissible. *See* Plaintiff's Response to Defendant's Objections and Motion to Strike the Evidence Cited by Plaintiff's Response to Defendant's Motion for Summary Judgment, at 2.

froth 9206, or that the cause of the problem when eventually determined would be other than the Autofroth 9206, it is insufficient to form the basis of a fraud claim. "The generally accepted rule in Texas jurisprudence is that future predictions and opinions ... cannot form a basis for fraud as a matter of law." *Zar v. Omni Industries, Inc.*, 813 F.2d 689, 693 (5th Cir.1987).

The court sees no way to construe the alleged statement by BASF as a representation of fact other than to construe it as an implied representation either: 1) that the Autofroth 9206 *was* not the cause of the bubbling problem; or 2) that *BASF had no knowledge that* the Autofroth 9206 was the cause of the problem. The court concludes that this would be a permissible, although not necessary, construction of the alleged statement. The problem with this construction of BASF's advice is that Alcan must demonstrate not only a representation but also a *misrepresentation.* That is, Alcan must show that at the time of the statement BASF either knew that the Autofroth 9206 was in fact the cause of the problem, or had substantial evidence (which it did not share with Alcan) indicating this, or at least made the implied statement in reckless disregard of its truth.[13] Alcan's efforts to make such a showing are insufficient. Alcan points to an October 26, 1994 letter from BASF reporting results of its testing of defective panels provided by Alcan, *see* Plaintiff's Appendix, Exhibit GG, and BASF's internal documents concerning the actual test results, *see id.*, Exhibit FF. Alcan describes the latter as containing "a confusing, ambiguous set of numbers" and stating that "BASF could not determine whether the elevated level of R–22 was 'causing cells [in the foam] to rupture, which in turn may lead to blister formation.'" Plaintiff's Re-

sponse Brief at 16 (quoting BASF's October 26, 1994 letter). The actual test results, Alcan contends, showed that BASF had established the Autofroth 9206 as the cause of the problem. "These detailed test results, obtained by Alcan through discovery in this lawsuit, would have shown to Alcan higher level of R–22 in the foam coupled with the lack of problems in adhesion would squarely place the source of the 'bubble' on BASF's foam." *Id.*

The court disagrees with Alcan's interpretation that the documented test results disclose BASF's knowledge of significant information not disclosed in the letter sent to Alcan. The only "higher level of R–22" disclosed in the exhibit in question is the contrast between the "bulge" area of the tested panel and a "control." The same numbers are disclosed in the October 16, 1994 letter to Alcan. It is, of course, possible that the test results documentation contains critical information that is not obvious to the court but would be obvious to a trained expert. If so, however, Alcan has not pointed out and explained such information and exactly how it shows BASF's substantial causation knowledge that was withheld from Alcan. In fact, the January 13, 1995 internal BASF memorandum (which Alcan sees as evidence of BASF's attempts to hide the truth from Alcan) indicates that at that date BASF had still not completed its analytical work or determined whether Autofroth 9206 released substantially higher levels of gases than Autofroth 9313. *See* Plaintiff's Appendix, Exhibit T.

Based on the evidence submitted, the court can only treat Alcan's assertion, that BASF had knowledge as to the causation of the bubbling problem no later than October 26, 1994 which it did not share with Alcan, as a conclusory allegation inade-

---

**13.** As noted above, a claim based on fraud requires a showing that BASF knew that the representation was false when it was made. Unlike BASF's challenge based on causation and whether reliance was justified, which the court does not consider, *see supra* note 11, this requirement of knowledge that the repre-

sentation is false is fairly subsumed within BASF's challenge that Alcan had no evidence of any *mis* representation. The court concludes that Alcan had adequate notice of the need to demonstrate this element in its response to the motion for summary judgment.

quately substantiated. Accordingly, the court concludes that Alcan has not established a genuine issue of material fact as to at least one element of its fraud and/or fraudulent concealment claim. BASF therefore is entitled to judgment as a matter of law as to this claim.

### D. *Texas Deceptive Trade Practices Act Claim*

 Alcan's claim under the DTPA is precluded by the clear language of the statute. The DTPA provides a cause of action for a "consumer." Tex. Bus. & Com. Code Ann. § 17.50 (West Supp.2001). Alcan admits that it is a "business consumer," *see id.* § 17.45(10), and has assets in excess of $25 million, *see* Counter–Defendant's First Amended Original Answer to BASF's Counterclaim ¶ 1. A "business consumer" with assets in excess of $25 million is specifically excluded from the definition of "consumer." *See* Tex. Bus. & Comm. Code Ann. § 17.45(4). Despite Alcan's assertions to the contrary, Alcan is not a "consumer" under the plain terms of the statute, and therefore has no cause of action under the DTPA. Alcan's only argument in opposition to this conclusion is that the DTPA provision excluding business consumers with assets in excess of $25 million from coverage violates the equal protection provisions of the Texas and federal Constitutions. Alcan offers no case law or similar support for this argument, pointing out only that it is "unfair" to allow Alcan's customers to sue Alcan (and collect treble damages) under the DTPA while Alcan cannot sue BASF under the DTPA. The court has given full consideration to this argument, but concludes that it is without merit.

 A statute, challenged on equal protection grounds as discriminating based on wealth, "must be sustained if rationally related to a legitimate Government inter-est." *Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 859 n. 17, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984); *see also Browning–Ferris Industries, Inc. v. Lieck,* 845 S.W.2d 926, 946–47 (Tex.App.—Corpus Christi 1992) (wealth is not a suspect classification for purposes of equal protection analysis under either federal or Texas constitutions), *rev'd on other grounds,* 881 S.W.2d 288 (1994). When, as here, a statutory provision does not "burden a suspect group or a fundamental interest," the court presumes that the statute is rationally related to a legitimate government interest and "will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley,* 440 U.S. 93, 96–97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979).

The court concludes that there are legitimate government purposes that could support the statutory distinction. The wealthy, along with all consumers, have other protections against deceptive trade practices, as demonstrated by Alcan's other claims in this action. Only the *additional* protection offered by the DTPA is at issue. Those with less wealth are presumably less able to protect themselves adequately against deceptive trade practices and more in need of the additional protection of the DTPA. Business consumers with assets in excess of $25 million can also exert more influence on those with whom they do business, such that treble damages are less likely needed to deter deceptive trade practices.

The only counter-argument raised by Alcan is that the wealthy need as much protection against deceptive trade practices as those who are not wealthy.[14] As

---

14. Alcan also seems to imply that, since its customers can get treble damages against it, it will wind up paying out more to its customers than it could recover against BASF. If that

is indeed what Alcan means to argue, it is clearly incorrect. If one of its customers paid Alcan $1,000 originally and recovers $3,000 pursuant to a DTPA claim, the customer's

discussed above, the court disagrees. A decision not to provide the additional DTPA protection to the wealthy [15] is consistent with a rational conclusion on the Legislature's part, and therefore does not violate the equal protection clause.

The court further notes that, even if Alcan's equal protection argument were successful, the DTPA claim would still not be available. DTPA claims must be brought

> within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice. The period of limitation provided in this section may be extended for a period of 180 days if the plaintiff proves that failure timely to commence the action was caused by the defendant's knowingly engaging in conduct solely calculated to induce the plaintiff to refrain from or postpone the commencement of the action.

Tex. Bus. & Comm.Code Ann. § 17.565 (West 1987).[16] Alcan sent a letter to BASF on December 16, 1994 describing the "bubbling" problems with its panels, and concluding that the problems "are a direct result of the change to Autofroth 9206." Plaintiff's First Amended Complaint, Exhibit A. The letter goes on to request specifically that BASF reimburse Alcan for its direct expenses incurred as a result of warranty claims by customers for these problems. Alcan does not address this letter in its response, but asserts only that it "only recently obtained the 'critical' element of causation required to start the limitations period running," without explaining what triggered that realization.[17] Alcan's conclusory assertion is insufficient to refute BASF's argument. The DTPA provision does not require that a plaintiff have irrefutable evidence of the violation before the statute of limitations starts running, and reasonable diligence consists of more than asking the suspected wrongdoer whether it caused the problem. Alcan clearly had sufficient evidence supporting causation to demand reimbursement despite the value that Alcan placed on its business relationship with BASF.[18] The court concludes that the December 16, 1994 letter demonstrates sufficient knowledge on Alcan's part, on that date or earlier, to initiate its DTPA claim, and Alcan

"damages" are $1,000 but Alcan's consequential "damages" would be $3,000. Alcan does not need the DTPA treble damages provision, only a judgment in its favor, to recover as much from BASF as Alcan has paid out to its customers.

**15.** Typical equal protection challenges based on wealth involve alleged discrimination against the less wealthy, and absent "invidious discrimination against the poor," *Fuller v. Oregon*, 417 U.S. 40, 48 n. 9, 94 S.Ct. 2116, 40 L.Ed.2d 642 (1974), even those are generally unsuccessful. *See, e.g., Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 458–62, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988); *Selective Service System*, 468 U.S. at 859 n. 17, 104 S.Ct. 3348. The court is unaware of *any* successful equal protection challenge that a statute discriminates against the wealthy.

**16.** Alcan asserts tolling based on the discovery rule and the fraudulent concealment doctrine. The court need not consider those rules, since the DTPA limitations provision is equivalent in effect—the statute of limitations begins to run only when the Alcan knew, or should have known with reasonable diligence, of the deceptive trade practice.

**17.** Plaintiff's Response Brief at 18. In fact, Alcan asserts that "BASF continued to conceal the damning results of its reports from Alcan until after this lawsuit was filed." *Id.* at 17. If Alcan had sufficient information without this material obtained during discovery, Alcan has not explained what other information, not available in 1994 but obtained prior to the filing of the lawsuit, was the crucial element. Certainly Alcan would not be justified in waiting until it had conducted sufficient testing to prove conclusively the cause of the problem, when it already strongly suspected the cause in 1994.

**18.** The December 16, 1994 letter says, immediately before the demand for reimbursement, that "[w]e value our relationship with OLIN/BASF and long standing history of successful production using your products. . . . We need your help to continue to build confidence in AF 9313."

therefore should have filed its lawsuit no later than December 16, 1996. Alcan also does not adequately explain how BASF's actions caused it to delay filing the suit. Because this action was filed (in state court) on May 16, 1997, the court concludes that it was not filed within the requisite two year period and is barred by the DTPA's statute of limitations.

For two independent reasons, that Alcan lacks standing for a DTPA claim and that the action was filed after the statute of limitations had expired, the court concludes that BASF is entitled to judgment as a matter of law on the DTPA claim. BASF also argues that Alcan is unable to prove causation. Because of the court's ruling, it need not address this additional ground for summary judgment.

### E. Negligent Misrepresentation and Professional Negligence Claims

■ BASF challenges Alcan's tort claims, among other grounds, based on the "economic loss" doctrine. "[U]nder Texas law, a plaintiff cannot recover economic losses resulting from a defective product based on a negligence theory." *Hininger v. Case Corp.*, 23 F.3d 124, 126 (5th Cir. 1994). Accordingly, if the damages Alcan seeks under its negligent misrepresentation and professional negligence claims[19] are only "economic losses," those causes of action must be dismissed.

■ As a general matter, economic losses affect only a party's pocketbook, as opposed to personal injury or physical injury to property. *See, e.g., Two Rivers Co. v. Curtiss Breeding Serv.*, 624 F.2d 1242, 1245–46 (5th Cir.1980). Economic loss has both direct and consequential components:

Direct economic loss may be said to encompass damage based on insufficient product value; thus, direct economic loss may be "out of pocket"—the difference in value between what is given and

received—or "loss of bargain"—the difference between the value of what is received and its value as represented. Direct economic loss also may be measured by costs of replacement and repair. Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product.

*Nobility Homes of Tex., Inc. v. Shivers*, 557 S.W.2d 77, 78 n. 1 (Tex.1977) (quoting Note, Economic Loss in Products Liability Jurisprudence, 66 Colum. L.Rev. 917, 918 (1966)). Economic loss includes injury to the product that is itself the subject of the contract. "In transactions between a commercial seller and commercial buyer, when no physical injury has occurred to persons or *other property*, injury to the defective product itself is an economic loss governed by the Uniform Commercial Code." *Mid Continent Aircraft Corp. v. Curry County Spraying Serv., Inc.*, 572 S.W.2d 308, 313 (Tex.1978) (emphasis added). Economic loss does not, however, extend to damage to other property. "Where ... collateral property damage exists *in addition to* damage to the product itself" the plaintiff can recover in tort as well as in contract. *Signal Oil & Gas Co. v. Universal Oil Products*, 572 S.W.2d 320, 325 (Tex.1978) (emphasis added). The only injuries that Alcan alleges, in response to BASF's assertion of the economic loss doctrine, are warranty claims from purchasers of the panels that Alcan produced using the Autofroth 9206. *See* Plaintiff's Response Brief at 21. The court must therefore decide whether the panels themselves constitute "other property."

■ Usually the distinction is straightforward. *See, e.g., Signal Oil & Gas*, 572 S.W.2d at 325 (defective product was a reactor charge heater; other equipment in the refinery, product, and catalyst were "other property"). The boundary between

---

**19.** BASF seems to assert that the economic loss rule precludes all of Alcan's tort claims. The Texas Supreme Court, however, has specifically rejected the application of this doctrine to fraud claims. *See Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex.1998).

the subject matter of a contract and "other property" when the former is a component of the latter, however, is not completely clear. When a plaintiff purchases a machine as a whole from the defendant, without bargaining separately for individual components, injury to the machine as a whole caused by a defective component is still economic loss. *See, e.g., American Eagle Ins. Co. v. United Technologies Corp.,* 48 F.3d 142, 144–45 (5th Cir.1995) (aircraft with defective engine; the relevant inquiry is "whether the parties bargained separately for individual components"). The end user also cannot recover in tort against the component manufacturer in such instances. *Hininger,* 23 F.3d at 127; *Essex Ins. Co. v. Blount, Inc.,* 72 F.Supp.2d 722, 725 (E.D.Tex.1999) ("In determining whether the product injured itself, the court looks to the product as a whole; thus a manufacturing [sic] of a component part cannot be sued under a tort theory of recovery for economic losses.").

In *Hininger* and *Essex Insurance,* the plaintiff received the integrated product as a whole,[20] rather than receiving a defective component and assembling it into an integrated product (either for resale or for its own use). That is at least potentially a relevant distinction. Texas courts have apparently never directly addressed the question of whether, in the latter situation, damage that extends beyond the component (the Autofroth 9206) to other parts of the assembled product (the panels) constitutes damage to "other property." Other jurisdictions, however, have concluded in similar situations that damage to the product as a whole is *not* damage to "other property." *See, e.g., Sea–Land Service, Inc. v. General Elec. Co.,* 134 F.3d 149, 154–55 (3d Cir.1998) (defective replacement parts damaged engine in which installed); *American Home Assurance Co. v. Major Tool & Mach., Inc.,* 767 F.2d 446,

446–48 (8th Cir.1985) (turbine assembler sued manufacturers of inner housing and turbine case for damages to turbine vanes and blades); *Northland Power v. General Electric Co.,* 105 F.Supp.2d 775, 790–92 (S.D.Ohio 1999) (defective replacement gas generator engine damaged other parts of turbine). In fact, other courts have even held that totally distinct property that is *used in connection with* a defective product would not constitute "other property" for purposes of the economic loss rule. *See, e.g., Palmetto Linen Serv., Inc. v. U.N.X., Inc.,* 205 F.3d 126, 128–30 (4th Cir.2000) (malfunction in chemical dispensing system for commercial washers resulted in destruction of linens); *Agristor Leasing v. Guggisberg,* 617 F.Supp. 902, 907–08 (D.Minn.1985) (defective animal feed storage system caused damage to alfalfa seed and cows).

The most common rationale for such conclusions is that damage to the other components was clearly foreseeable, or even inevitable, in the context of the commercial transaction. "In such cases the 'failure of the product to perform as expected will necessarily cause damage to other property,' rendering the other property damage inseparable from the defect in the product itself." *Palmetto Linen Service,* 205 F.3d at 130 (quoting *Neibarger v. Universal Cooperatives, Inc.,* 439 Mich. 512, 486 N.W.2d 612, 620 (1992)); *see also Northland Power,* 105 F.Supp.2d at 791 ("only property damage that is impossible to foresee at the time a bargain is struck can be regarded as 'other property' for purposes of the economic loss doctrine"). The parties can protect themselves from foreseeable consequences in the contract, which is more efficient than tort remedies.

Similarly, it is difficult to imagine a scenario in which the natural consequence of an installed structural component's failure would be damage only to the

---

**20.** Those cases would be analogous to a suit by Alcan's *customers* against BASF, but that is

not this case.

structural component itself without any damage to the surrounding property. If such economic damage is a foreseeable consequence to the parties in a commercial relationship governed by the UCC, then it is a proper subject for negotiation and contract law, not for tort remedies.

*Dakota Gasification Co. v. Pascoe Bldg. Systems,* 91 F.3d 1094, 1100 (8th Cir.1996).

Some courts reach the same result by focusing on "the nature of the defect and the manner in which the damage occurred." *Minneapolis Soc'y of Fine Arts v. Parker–Klein Associates Architects, Inc.,* 354 N.W.2d 816, 821 (Minn.1984), *overruled on other grounds, Hapka v. Paquin Farms,* 458 N.W.2d 683 (Minn.1990).

Where the damage results from deterioration, internal breakage, depreciation, or *failure to live up to expectation,* these courts would allow recovery only on a contract or warranty theory. Where the damage results from hazardous conditions or a sudden and calamitous occurrence, however, these courts would allow recovery under a tort theory. The rationale for this distinction is that tort law imposes a duty on manufacturers to produce safe products, regardless of whether the ultimate impact of the hazard is on people, other property, or the product itself. Contract or warranty law, on the other hand, has been traditionally concerned with redress of a purchaser's *disappointed expectations.*

*Id.* (citation omitted) (emphases added); *see also Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1173 (3d Cir.1981) ("[F]actors such as the nature of the defect, the type of risk, and the manner in which the injury arose.... bear directly on whether the safety-insurance policy of tort law or the expectation-bargain protection policy of [contract and] warranty law is most applicable to a particular claim.").

The court finds these rationales persuasive and believes that, if faced with the issue, Texas courts would come to the same conclusion, and characterize damage to a product caused by a defective component as "economic loss" rather than damage to "other property," and therefore not subject to recovery under a negligence theory. In this case, the only damage alleged was to the panels, manufactured by Alcan using BASF's product as a structural component. Damage to the panels from any defects in the Autofroth 9206 was certainly foreseeable, and the parties are sophisticated entities capable of protecting themselves in the contracting process. The damage to the panels was allegedly caused by a defective component rather than "hazardous conditions or a sudden and calamitous occurrence." The court therefore concludes that the economic loss doctrine applies, and that the damage to the panels does not constitute damage to "other property."

The court also notes that even if the economic loss doctrine did not apply, Alcan's negligence claims would fail because the statute of limitations had expired. Negligence claims are subject to a two-year statute of limitations. *Morriss v. Enron Oil & Gas Co.,* 948 S.W.2d 858, 869 (Tex.App.—San Antonio 1997, no writ). Even assuming *arguendo* that Alcan has satisfied the requirements of the discovery rule or fraudulent concealment doctrine, as noted above it clearly had sufficient knowledge to initiate the lawsuit no later than its December 16, 1994 letter. Accordingly, the statute of limitations expired well before this suit was filed on May 16, 1997.

Because Alcan's negligence-based claims are barred, both by the economic loss doctrine and by the statute of limitations, BASF is entitled to judgment as a matter of law on the negligent misrepresentation and professional negligence causes of action. BASF also argues that Alcan cannot establish the existence of any misrepresentations and that professional negligence does not apply to a contract for the sale of goods. Because of the court's ruling, it

need not address these additional grounds for summary judgment.

### F. *Counterclaim for Attorneys' Fees*

 BASF also moved for summary judgment with respect to its counterclaim against Alcan, for attorneys' fees for filing a DTPA claim that was "wholly groundless in fact or law and brought in bad faith." Defendant's Brief at 25. The DTPA provides for attorneys' fees to be awarded to a prevailing defendant under appropriate circumstances. "On a finding by the court that an action under this section was groundless in fact or law *or* brought in bad faith, *or* brought for the purpose of harassment, the court shall award to the defendant reasonable and necessary attorneys' fees and court costs." Tex. Bus. & Comm.Code Ann. § 17.50(c) (West Supp.2001) (emphasis added). A claim for attorneys' fees under this provision

> requires the court to determine the existence of groundlessness, bad faith and harassment.... A groundless action is defined as one having no basis in law or fact and not warranted by a good faith contention for modification, reversal, or extension of existing law. To establish bad faith, it must be shown the claim was motivated by a malicious or discriminatory purpose.

*McDuffie v. Blassingame,* 883 S.W.2d 329, 335 (Tex.App.—Amarillo 1994, writ denied).

BASF proffers no explicit evidence of bad faith, and relies on its arguments that Alcan lacked standing to sue under the DTPA and that the DTPA claim was filed after the expiration of the statute of limitations. Alcan does not directly address the counter-claim, but disputes BASF's arguments for the dismissal of the DTPA claim. The court therefore need not make a determination as to Alcan's motives for the claim, and instead must determine whether the claim was "groundless."

The court has ruled above that the DTPA claim clearly fails for two independent reasons. That ruling does not necessarily mean that the claim was groundless. The court's conclusion that the claim was barred by the statute of limitations relied on a determination as to when Alcan "discovered or in the exercise of reasonable diligence should have discovered" the alleged deception. Although the court concludes that the statute of limitations began running no later than December 16, 1994, this is a fact issue for which Alcan had an arguable (even if clearly wrong) basis for coming to a different conclusion.

The court's conclusion that Alcan lacked standing for a DTPA claim, however, is a different matter. That conclusion relied on undisputed facts and the explicit terms of the statute. Alcan's only defense is its argument for a "modification, reversal, or extension of existing law"—that the statutory provision limiting standing to business consumers with assets of less than $25 million violates the equal protection provisions of the Texas and federal Constitutions. That argument was unsupported by citation to any remotely relevant case law that might support Alcan's position, and rested upon a conclusory statement that entities with more than $25 million in assets need protection against deceptive trade practices just as much as other consumers. The court not only disagrees with Alcan's argument but also is unable to characterize it, at least as presented, as a "good faith contention." Accordingly, the court concludes that Alcan's DTPA claim was groundless and that BASF is entitled to attorneys' fees incurred in defending the DTPA claim as a matter of law.

 BASF is directed to file, no later than the pretrial conference, a motion for attorneys' fees supported by affidavit and other supporting documentation sufficient to determine the appropriate amount to be awarded. "Generally, when a suit involves more than one cause of action, including a cause of action in which attorney's fees are recoverable, the party seeking to recover such fees must present specific evidence indicating the amount of

time incurred on that cause of action." *Briercroft Serv. Corp. v. Perez*, 820 S.W.2d 813, 817 (Tex.App.—Corpus Christi 1990), *aff'd in part, rev'd in part on other grounds*, 809 S.W.2d 216 (Tex.1991). "[W]here several causes of action are so intertwined that they are inseparable, the party suing for attorney's fees may recover even though attorney's fees may not be recoverable on each separate cause of action." *Id.* The prevailing party's duty to segregate fees, however, is not excused simply because it may be difficult to do so. *United States ex rel. Varco Pruden Bldgs. v. Reid & Gary Strickland Co.*, 161 F.3d 915, 922 (5th Cir.1998).

## V. *Conclusion*

For the above-stated reasons, there is no genuine issue of material fact with respect to Alcan's claims for fraud and/or fraudulent concealment, negligent misrepresentation, professional negligence, breach of express and implied warranties, and violation of the DTPA. BASF is entitled to judgment as a matter of law as to those claims. Alcan has established a genuine issue of material fact as to causation, the sole ground advanced by BASF against the breach of contract claim, and BASF is not entitled to judgment as a matter of law as to that claim. Finally, BASF is entitled to judgment as a matter of law as to its counterclaim for attorneys' fees for a groundless claim under DTPA. Defendant's Motion for Summary Judgment is therefore granted in part and denied in part. Alcan's claims for fraud and/or fraudulent concealment, negligent misrepresentation, professional negligence, breach of express and implied warranties, and violation of the DTPA are hereby dismissed with prejudice. The sole claim remaining for trial is Alcan's claim for breach of contract. In addition, the amount of attorneys' fees to be awarded to BASF for a groundless claim under DTPA remains for determination by the court.